# United States Court of Appeals
## For the First Circuit

Nos. 05-2235, 05-2293

RUTH HATFIELD-BERMUDEZ,

Plaintiff, Appellant/Cross-Appellee,

v.

JOSÉ ALDANONDO-RIVERA, in his personal capacity and his official capacity as Director for the Program for the Education of Adults; AIDA L. BERRÍOS-GÓMEZ, in her personal capacity and in her official capacity as Director, Caguas Region,

Defendants, Appellees/Cross-Appellants,

CESAR A. REY-HERNANDEZ, in his personal capacity and official capacity as the Secretary of Puerto Rico Department of Education; SANTOS E. MELENDEZ, in his personal capacity and in his official capacity as General Supervisor for the Program for the Education of Adults; ROGELIO CAMPOS, in his personal capacity and in his official capacity for the Program for the Education of Adults; AVELINA RIVERA, in her personal capacity and in her official capacity as General Supervisor for the Program for the Education of Adults, Caguas Region; MARGARITA GONZALEZ, in her personal capacity and in her official capacity as Special Assistant of the Vocational Program, Caguas Region,

Defendants, Appellees.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Héctor M. Laffitte, U.S. District Judge]
[Hon. Gustavo A. Gelpí, U.S. Magistrate Judge]

Before

Torruella, Circuit Judge,
Selya, Senior Circuit Judge,
and Lynch, Circuit Judge.

---

    Francisco R. González, with whom F.R. González Law Office was on brief, for Ruth Hatfield-Bermudez.

    Sarah Y. Rosado-Morales, with whom Luis E. Padrón-Rosado and Sánchez Betances, Sifre, Muñoz Noya & Rivera, P.S.C. were on brief, for José Aldanondo-Rivera, Aida L. Berríos-Gomez, Cesar A. Rey Hernandez, Santos E. Melendez, Rogelio Campos, Avelina Rivera, and Margarita Gonzalez.

---

August 6, 2007

---

**LYNCH, <u>Circuit Judge</u>**.  A jury awarded Ruth Hatfield-Bermudez compensatory and punitive damages after defendants José Aldanondo-Rivera and Aida L. Berríos-Gómez failed to renew Hatfield's position as head of an adult education night school. The jury concluded that this non-renewal violated Hatfield's First Amendment political affiliation rights, as well as her rights under Article 1802 of the Puerto Rico Civil Code.  <u>See</u> P.R. Laws Ann. tit. 31, § 5141.  The magistrate judge, presiding with the consent of the parties, vacated the political discrimination verdict for lack of key evidence.  The judge also, acting well within his powers, granted a mistrial on the Article 1802 verdict based on improper comments by plaintiff's counsel.  On reconsideration, the magistrate judge reversed the grant of the mistrial after deciding that his curative instructions had been sufficient.

Hatfield appeals the grant of the Rule 50(b) motion on her political discrimination claim, as well as the earlier dismissal of a due process claim that she had also brought. Aldanondo and Berríos appeal the judgment against them on the Article 1802 claim.  We affirm.

## I.  BACKGROUND & PROCEDURAL HISTORY

A.      <u>Dismissal of the Due Process Claim</u>

Hatfield's complaint alleged that she had been working in her position for eight years under successive one-year contracts. Hatfield alleged that when her contract was not renewed for the

2001-2002 school year, the defendants deprived her of a property right without due process of law.

The defendants moved to dismiss the due process claim on the basis that Hatfield's own pleadings demonstrated that she had no property right in her continued employment. In an opinion dated February 11, 2003, the district court agreed and dismissed the due process claim.

For reasons unknown, defense counsel apparently believed the claim was still in the case by the time of trial, and he moved to dismiss this claim pursuant to Rule 50(a) after the close of the evidence. The magistrate judge granted the defendants' motion on the basis that even if the evidence established that Hatfield had a property right in the renewal of her contract, the defendants were entitled to qualified immunity because there was sufficient uncertainty that such a property right existed.

B.      The Political Discrimination and Tort Claims: The Evidence at Trial

The discrimination and tort claims were tried before a jury. We recount the key testimony.

Hatfield's night school operated under the auspices of the Puerto Rico Department of Education ("PRDE"), and Hatfield had a long career working for this agency. With the exception of a four-year stint working in the Caguas regional office, Hatfield's "day job" since 1980 had been to work as the principal of two different public schools in Cayey, Puerto Rico. In 1993, Hatfield

-4-

took on an additional post as a school director in a night school for adults. For several years she directed the night program at the Benigno Fernandez Garcia school. Enrollment surged, and that program was transferred to the larger Miguel Melendez Muñoz school. Hatfield continued as director, with her contract being renewed each year through the 2000-2001 school year.

Hatfield is a member of the New Progressive Party ("NPP"). From 1993 until early 2001, the NPP controlled Puerto Rico's governorship. After the 2000 elections, the Popular Democratic Party ("PDP") took power. The new administration quickly appointed new individuals to trust positions within the PRDE, including defendant Aldanondo, who was named the Director of Puerto Rico's Adult Education Program ("AEP"). Hatfield's night school operated within the AEP.

AEPs are partially funded with federal grant money. See 34 C.F.R. § 461.1. In Puerto Rico, the PRDE administers the AEP and decides which projects should be funded, but it must also comply with various procedural regulations issued by the federal government. As a result, the PRDE annually requires night school directors to fill out detailed funding proposals in order for their particular programs to continue in operation. The proposals must discuss the program, the needs of its students, the progress the program had made, the objectives for the coming year, and a number of other subjects. These proposals for continuing programs, along

with any proposals for new programs, are then submitted to the PRDE for approval. See id. §§ 461.30-33 (discussing the procedures that states must use for selecting the recipients of AEP funds).

In the spring of 2001, the new PDP administration initiated the proposal process for the coming 2001-2002 school year. Orientations were held in April to advise interested persons on how to prepare proposals.

Hatfield attended one of these orientations. At that session, a director asked whether the process for selecting school directors would be the same as it had been in previous years. Hatfield testified that Aldanondo answered the question by saying: "As you well know, there has been a change in administration. I recommend to you that you go by the regional office, to your regional director, . . . you go and stroke them." This last comment, to "go and stroke them," was an in-court translation of the Spanish phrase "pasarle la mano" -- a phrase that Aldanondo emphatically disputed using when he later testified. Hatfield testified that there was a big commotion immediately after Aldanondo made these comments. School directors "got up, started speaking out loud, and practically that was the end of the meeting."

Hatfield prepared a proposal for the 2001-2002 school year. The cover of the proposal lists Hatfield as the "Provider" of the proposal, and it lists the "School or Institution" as the

Miguel Melendez Muñoz High School. Another school director, Victor Ayala, submitted a proposal for the nearby Augustin Fernandez Colon School. Both proposals were approved, and these approvals were forwarded to the relevant regional office. These were the only two proposals submitted within the Cayey school district.

After the proposals had been approved, the PRDE began the process of hiring staff for the schools, including directors. Hatfield testified that in prior years, school directors would go for an interview, at the end of which each would be asked if he or she wished to continue directing. If the director answered "yes," and that director's proposal had been approved, the director would be given the position. If the director said "no," then the regional office would consider other candidates for that position. Hatfield's description of the old hiring process was reinforced by another witness.

This process changed in 2001. After a proposal was approved, the director was nevertheless required to compete for the school for which he had prepared the proposal. Hatfield's experience confirmed that the policy change was put into effect in the Caguas region, which encompassed Cayey.

Within that region, the hiring process after June 2001 was headed by the PRDE's Regional Director, defendant Berríos. Berríos is a member of the PDP, and the hiring for the 2001-2002 school year was the first hiring cycle in which she participated.

She testified that she had looked for documents explaining how the hiring process had previously operated in the region, and that the only useful document she found was a 1996 PRDE circular letter. This letter explained that regional directors had to prepare a list of interested and qualified candidates, from which the selection was to be made by a three-person committee. That committee was to consider the "academic background, experience, participation in training[,] and disposition of the candidate." Because this letter provided only limited guidance, Berríos met with her operations manager, Ramona Nieves, to design procedures for interviewing and selection. Nieves is the wife of the Mayor of Comerío and a PDP activist.

Berríos and Nieves devised a point system to rank candidates, with a maximum of 90 available points. Some 30 points would be based on a candidate's academic qualifications, experience within the PRDE generally, and experience teaching adults. The remaining 60 points would be based on how the committee evaluated the candidate's response to one written and one oral question, with 30 points allocated to each question. The two questions were open-ended and did not have clearly correct answers. After the interviewing committee assigned points to each candidate, it would rank the candidates by point totals. Berríos would then go down the list, in order, offering director positions.

Berríos was not part of the committee conducting the interviews. The three members were Avelina Rivera, Rogelio Campos, and Margarita Gonzalez. Rivera represented the central office and was placed on the committee by Aldanondo. Campos had been selected for the committee by the prior Regional Director before that director left her position. Gonzalez was placed on the committee by Berríos.

Hatfield was interviewed by the committee, and she gave her answers to the oral and written questions. Rivera then asked a few questions about Hatfield's academic background. At the end of the interview, Hatfield said to Rivera: "[R]emember, I'm interested in continuing working." Rivera responded that she was aware of this.

At no point in the interview did anyone discuss Hatfield's proposal for the Miguel Melendez Muñoz school. This was not an oversight. Indeed, Berríos testified that she understood the proposal process to be completely separate from the process for hiring directors. The hiring process she and Nieves designed did not directly account for the fact that a director had previously prepared a proposal for, or had worked at, a given school. The unsurprising result was that the Caguas region saw significant turnover in the identity of its directors. Of the roughly 12-16 night schools in the Caguas region, only a single school had the same director in 2001-2002 as in the prior year.

Hatfield was one of the many directors not reappointed. After the interviews had finished, and all the points had been assigned and tallied, Hatfield had 70 points. This left her ranked third among all candidates who had applied for positions in Cayey. (As had been done in previous years, candidates formally applied to work in a school district, not at an individual school). Ranked above Hatfield were Luis Enchauste, who received 78 points, and Maria Roldán, who received 71 points. Ranked below Hatfield were Miriam Cartagena and Ayala, the incumbent director of the Augustin Fernandez Colon school. Testimony linked Enchauste with an affiliation with the PDP; there was no admissible evidence regarding the political affiliations of Roldán, Ayala, or Cartagena.[1]

Hatfield scored quite well with regard to the 30 points allocated to experience and background, although she received one less point than Enchauste received in this category. Hatfield

_____

[1] Hatfield did testify about Roldán's affiliation, but the magistrate judge struck all of that testimony as hearsay. Hatfield does not challenge that ruling on appeal.

The defendants briefly assert that Hatfield's testimony about Enchauste, in which she described how Enchauste sometimes wore PDP insignia, also should have been stricken as hearsay. In the defendants' view, Enchauste's decision to wear the insignia was in effect an out-of-court statement of his political views. But even assuming that Hatfield's testimony was inadmissible to show Enchauste's political affiliation, the testimony would still have been admissible to demonstrate the beliefs of PRDE officials that Enchauste was affiliated with the PDP. See United States v. Parsons, 141 F.3d 386, 390-91 (1st Cir. 1998) (explaining that out-of-court statements are admissible to demonstrate the motive of one who heard the statement).

scored somewhat lower than Enchauste and Roldán with regard to the 60 points allocated to the written and oral questions.

As Enchauste had the highest total score, Berríos met with him first to offer him his choice of positions in Cayey. He did not accept either of the positions. The second person on the list was Roldán, who accepted a position directing the school Hatfield had previously directed, the Miguel Melendez Muñoz school.

Hatfield was the third person on the list, and Berríos offered her the directorship of the remaining school, the Augustin Fernandez Colon school.[2] Hatfield refused, explaining that she had not drafted the proposal for that school, and that because of her "honesty and work quality" she was unwilling to supplant Ayala, the previous director.[3] Berríos then offered Hatfield the opportunity to direct a school in a different school district, but Hatfield declined that offer as well.

C.      The Motion for a Mistrial

Throughout, this trial was marked by unusually heated bickering between trial counsel. During plaintiff's questioning of witnesses, defense counsel lodged a rather large number of

---

[2] Hatfield testified that she immediately asked Berríos why she was not being given the Miguel Melendez Muñoz school, and that Berríos responded that the interviewing committee had made the decision based on Hatfield's health. Berríos denied saying this.

[3] Hatfield also testified that she refused the job in part because she was offended that she was not offered the directorship of the school for which she had prepared the proposal and at which she had come to be very familiar with the students.

objections (many of which were sustained).  The attorneys on both sides made some inappropriate comments in front of the jury.  The magistrate judge clearly became frustrated with counsel at times and offered some stern warnings.

At one point, plaintiff's attorney was seen to be listening to a personal recording to assist him in examining defendant Aldanondo.  The attorney did so to demonstrate, or to at least leave the impression, that Aldanondo was lying on the stand about something he had previously said.  The earlier statements were allegedly recorded during a break at a deposition, and were not transcribed.  Listening to the recording was a direct violation of the court's instructions to plaintiff's counsel that this line of questioning could be based only on his personal recollection of the statement.  Plaintiff's counsel's actions led to multiple objections and sidebar conferences.  After being admonished, plaintiff's counsel then attempted to ask his question in several alternative manners; all were objected to, and almost all of these objections were sustained.  The judge reminded the jury that simply because counsel was asking these questions, it did not mean that the defendant actually made the disputed statements.

Right before closing arguments the magistrate judge instructed the jury: "[I]f at any time I admonished counsel, and I did it throughout trial, I admonished both counsel at times, you cannot take that against or in favor of any of the parties.  It

-12-

happens in every trial." The judge also reminded the jury that the closing arguments they were about to hear were not evidence, and that they were to base their verdict only on the evidence presented, not on their perceptions of the quality of counsels' arguments.

This last warning proved to be prescient. Plaintiff's attorney spoke first on closing, and his first comment to the jury was that he would "always remember this case as the objections case." Much of the remainder of the argument was more closely related to the evidence, although there were some lapses, including one in which plaintiff's counsel offered his personal opinion on Berríos's testimony. There were no objections to these lapses.

The defense attorney then opened with several comments suggesting that his many objections had been prompted by extremely poor lawyering from the other side. The bulk of the defendants' closing argument largely stuck to discussing the evidence presented in the case.

Plaintiff's counsel started his rebuttal by stating: "I will always, always remember this case as the objections and obstructions case. Always I will remember that. And [in my career,] let me tell you, always over the table, everything, everything, everything over the table." Counsel then attempted to dispute something that defense counsel had said by showing a document to the jury. This prompted an objection, and at sidebar

it was established that the document was not in evidence. The magistrate judge told plaintiff's attorney that he could not use the document during closing. Defense counsel asked for a mistrial, a request that the judge said he would defer ruling on. The judge specifically instructed the jury to disregard the document because it was not in evidence.

Plaintiff's counsel continued his rebuttal with more suggestions that the defense had withheld documents and lied to the jury:

> Everything I brought here was over the table. Everything. Truthfulness.
> I have lost some cases in my life, but always with the truth, not obstructing the truthfulness in any case. And I assure that until I die. I will do that. If I win any case, it has to be with the truth. I doesn't [sic] fabricate. I doesn't [sic] obstruct. I doesn't [sic] hide evidence.
> I am not the plaintiff in this case. I am not. I am just an instrument. I am just a fellow who was brought up together with Ruth Hatfield. Yes. Both of us grew [up] together in Cayey. Both of us have cancer. It's very easy to take things out of context.

Defense counsel asked to approach the bench, but the magistrate judge denied the request. Plaintiff's counsel proceeded to focus his rebuttal more on the evidence. After plaintiff's counsel finished, the judge reminded the jurors that what they had just heard were "arguments of counsel. Arguments are not evidence. It's just what counsel understands they have proven to you. But

-14-

you must ultimately look to the evidence in the case . . . to determine as to which party you will find."

D.        The Verdict and the Post-Trial Motions

By the time the case was submitted to the jury, the only remaining defendants were Aldanondo and Berríos.[4]  The jury found for Hatfield on both the political discrimination and Article 1802 claims.  The jury awarded $50,000 in compensatory damages.  It also awarded $100,000 in punitive damages specifically for the political discrimination claim.

Post-verdict, the defendants filed a motion for judgment as a matter of law under Rule 50(b), and in the alternative asked the judge to declare a mistrial.  The Rule 50 part of the motion was geared almost exclusively to the verdict on the political discrimination claim, and it only very briefly mentioned the Article 1802 claim.

The magistrate judge granted the Rule 50 motion as to the political discrimination claim, based on two independent reasons.  First, the magistrate judge concluded that part of plaintiff's burden was to demonstrate that defendants Aldanondo or Berríos were aware of Hatfield's political affiliation, as required by law.

---

[4] After resting, plaintiff voluntarily dismissed her case against Campos, who had been named as a defendant.  Additionally, before closing arguments the magistrate judge granted judgment as a matter of law for defendants Cesar Rey-Hernandez and Santos Melendez, as well as for Gonzalez and Rivera (who had also been named as defendants).  Those judgments are not challenged on appeal.

Second, the magistrate judge concluded that there was no evidence that either Berríos or Aldanondo had been personally involved in the allegedly discriminatory acts, which precluded a finding of liability against either of them.

The magistrate judge also stated that he did not understand the defendants' motion to be seeking judgment as a matter of law on the Article 1802 claim, and he declined to enter judgment for the defendants on that claim. Nonetheless, the judge decided to grant a new trial on the Article 1802 claim, based on plaintiff's attorney's improper comments during trial, particularly during closing argument. The judge, citing Suarez Matos v. Ashford Presbyterian Community Hospital, 4 F.3d 47, 50-51 (1st Cir. 1993), explained that the comments improperly injected personal and emotional issues into the trial, and that they improperly suggested that defense counsel had withheld evidence.

Hatfield moved for reconsideration. The magistrate judge declined to reconsider his decision on the Rule 50 motion. But the judge did reverse his decision to grant a new trial on the Article 1802 claim. He concluded that the case he had relied upon, Suarez Matos, was distinguishable in an important respect: the trial court in Suarez Matos had affirmatively permitted the improper argument, whereas here the magistrate judge had offered several curative instructions. Accordingly, the magistrate judge "agree[d] with

plaintiff that any prejudicial effect was neutralized," and he reinstated the jury verdict on the Article 1802 claim.

## II.  THE DUE PROCESS CLAIM

We assume arguendo that the grant of qualified immunity on the due process claim is properly before us on appeal from the grant of a Rule 50(a) motion.[5]  Our review of the immunity conclusion is de novo. Burton v. Town of Littleton, 426 F.3d 9, 14 (1st Cir. 2005).

Qualified immunity has three prongs in this circuit: we must inquire (1) if the plaintiff's facts can establish a constitutional violation; (2) if the constitutional right at issue was clearly established at the time of the violation; and (3) if a reasonable official, situated in a position similar to the defendants', would have understood his actions to be constitutional. Limone v. Condon, 372 F.3d 39, 44 (1st Cir. 2004). The general rule is that we will treat these questions sequentially, see id.; see also Saucier v. Katz, 533 U.S. 194, 201

---

[5] Defendants briefly suggest that Hatfield's appeal is untimely because it was brought more than 30 days after the district court partially granted the defendants' Rule 12(b)(6) motion. However, the partial judgment that the district court granted was not a partial judgment pursuant to Rule 54(b), as there was nothing indicating an intention by the district court to make an "express determination" that there was "no just reason for delay." Fed. R. Civ. P. 54(b). As a result, the partial judgment did not create a final appealable order. See Willhauck v. Halpin, 953 F.2d 689, 701-02 (1st Cir. 1991).

-17-

(2001), although there can be exceptions to this order of inquiry.

See, e.g., Santana v. Calderón, 342 F.3d 18, 29-30 (1st Cir. 2003).

We begin with a discussion of the alleged procedural due process violation. Hatfield must show that she was deprived of an interest in "liberty" or "property" without due process of law. See Correa-Martinez v. Arrillaga-Belendez, 903 F.2d 49, 53 (1st Cir. 1990), overruled in part on other grounds by Educadores Puertorriqueños En Acción v. Hernández, 367 F.3d 61, 63-67 (1st Cir. 2004). Here, Hatfield alleges that she had a property interest in her continued employment.

Property interests are "created and . . . defined by existing rules or understandings that stem from an independent source such as state law." Bd. of Regents v. Roth, 408 U.S. 564, 577 (1972). That independent source must give the individual a legitimate claim of entitlement to some sort of benefit. See Town of Castle Rock v. Gonzales, 545 U.S. 748, 756 (2005). Hatfield's claim is that while she had no formal contract right to renewal, the PRDE had a de facto policy of rehiring all interested directors whose proposals were approved, and who had no performance problems, thus establishing a property interest in the renewal of her contract.

The Supreme Court left open the possibility that some employees could have a property interest in the renewal of their term contracts. See Perry v. Sindermann, 408 U.S. 593, 594-95,

-18-

601-02 (1972). While mere subjective expectancy of renewal is not enough, the policies and practices of an institution might give rise to such a claim. Id. at 603.

This provision for "de facto" property interests is not an unlimited opening. If such de facto understandings contravene state law, there is usually no legitimate expectation of renewal and hence no property interest. Correa-Martinez, 903 F.2d at 55; see also Perry, 408 U.S. at 602 n.7 ("If it is the law of Texas that a teacher in the respondent's position has no contractual or other claim to job tenure, the respondent's claim would be defeated."). Accordingly, when we encounter a Perry-type claim, we look at whether the alleged de facto system conflicts with state law. See, e.g., Correa-Martinez, 903 F.2d at 54-55; Cheveras Pacheco v. Rivera Gonzalez, 809 F.2d 125, 127 (1st Cir. 1987). Indeed, we have been particularly cognizant of the problems that can result if mid-level managers can essentially undermine a legislature's decision to provide flexibility in a civil service hiring system. See Correa-Martinez, 903 F.2d at 54-55.

Here, a reasonable person could easily conclude that Puerto Rico law did not permit the de facto tenure system described by Hatfield's witnesses. In Department of Natural Resources v. Correa, 18 P.R. Offic. Trans. 795 (1987), the Puerto Rico Supreme Court concluded that a "transitory employee" like Hatfield, see P.R. Laws Ann. tit. 3, § 1462b(i), has "a job retention expectancy

only during the term of the appointment." 18 P.R. Offic. Trans. at 804. Moreover, the court explained that these informal procedures circumvent state law, "destroy the merit principle[,] and . . . run counter to the interests and needs" of Puerto Rico. Id. at 807. The court viewed its decision as "strengthen[ing] the merit principle in [Puerto Rico's] public administration." Id.

At the same time, however, the Puerto Rico Supreme Court has indicated that there may be certain circumstances in which a transitory employee could have a legitimate expectancy of contract renewal. See id. at 805-06; see also Lupiáñez de González v. Cruz, 5 P.R. Offic. Trans. 966 (1977) (finding, on the facts of the case, that a contract employee had a legitimate expectation of permanent employment). But it is not entirely clear whether the Puerto Rico Supreme Court has subsequently clarified its position since 1987; if there are more relevant cases, they are in Spanish, and we have not been provided with translations. Cf. Giovanetti v. Estado Libre Asociado de P.R., 2004 TSPR 46 (untranslated) (appearing to discuss Correa and the issue of property interests for transitory employees); Garcia Melendez v. Municipio de Arroyo, 140 P.R. Dec. 750, 754-55 (P.R. 1996) (untranslated) (same).

Given the circumstances, we bypass the standard Saucier order of inquiry, thereby freeing us to ask if Hatfield's alleged constitutional right had been clearly established at the time of the alleged violation. Cf. Santana, 342 F.3d at 30 (bypassing

<u>Saucier</u>'s step one in a procedural due process case where the existence of a property right turned on an unresolved question of Puerto Rico law).[6]

While it may be established that due process applies to protect property interests, it is not clearly established that the interest Hatfield had was a property interest at all. Immunity was properly granted.

### III. THE POLITICAL DISCRIMINATION CLAIM

We review de novo the magistrate judge's decision to grant defendants' Rule 50(b) motion for judgment as a matter of law on the political discrimination claim. <u>See</u> <u>Webber</u> v. <u>Int'l Paper Co.</u>, 417 F.3d 229, 233 (1st Cir. 2005). We must view the evidence in the light most favorable to Hatfield. <u>Id.</u>

The magistrate judge offered two reasons for granting the Rule 50(b) motion. The first reason was that Hatfield introduced no evidence that the defendants were aware of her political

---

[6] Indeed, the whole premise for <u>Saucier</u>'s order of inquiry is that it helps "set forth principles which will become the basis for a holding that a right is clearly established." <u>Saucier</u>, 533 U.S. at 201. Given the context in which we face our current inquiry, our resolution of the constitutional issue would be dependent on ruling on an unclear question of Puerto Rico law. This would hardly create clearly established law for future cases. <u>Cf.</u> <u>Morse</u> v. <u>Frederick</u>, 127 S. Ct. 2618, 2641 (2007) (Breyer, J., concurring in the judgment in part and dissenting in part) (criticizing the <u>Saucier</u> order of inquiry); <u>Dirrane</u> v. <u>Brookline Police Dep't</u>, 315 F.3d 65, 69-70 (1st Cir. 2002) (explaining that <u>Saucier</u>'s order of inquiry is "an uncomfortable exercise where . . . the answer . . . [to the constitutional question] may depend on a kaleidoscope of facts not yet fully developed. It may be that <u>Saucier</u> was not strictly intended to cover [such a] case").

affiliation.  The second reason was that Aldanondo and Berríos were not personally involved in any discrimination against Hatfield. See Barreto-Rivera v. Medina-Vargas, 168 F.3d 42, 48 (1st Cir. 1999) (explaining that § 1983 does not usually allow for supervisory liability).  The rationale on this second point was apparently that the real discriminatory actors, if any, were the members of the evaluation committee who allegedly deflated Hatfield's interview scores on the basis of her political affiliation.

Hatfield's response is that Aldanondo and Berríos fall into an exception for § 1983's general bar against supervisory liability because they encouraged, condoned, or otherwise acquiesced in the allegedly discriminatory actions of the evaluation committee.  Indeed, a supervisor can be held liable for the discrimination of his subordinates if (1) the subordinate commits a constitutional violation, and (2) the supervisor's actions are "'affirmatively link[ed]' to the behavior in the sense that it could be characterized as 'supervisory encouragement, condonation or acquiescence' or 'gross negligence . . . amounting to deliberate indifference.'"  Whitfield v. Meléndez-Rivera, 431 F.3d 1, 14 (1st Cir. 2005) (alteration and omission in original) (quoting Hegarty v. Somerset County, 53 F.3d 1367, 1379-80 (1st Cir. 1995)).

-22-

Hatfield's argument nonetheless overlooks a crucial point: her failure even to make out a prima facie case that the committee members violated her First Amendment rights. To establish a prima facie case of political discrimination, the "plaintiff must show that party affiliation was a substantial or motivating factor behind a challenged employment action." Mercado-Alicea v. P.R. Tourism Co., 396 F.3d 46, 51 (1st Cir. 2005). A prima facie case is not made out when there is no evidence that an actor was even aware of the plaintiff's political affiliation. See Aguiar-Carrasquillo v. Agosto-Alicea, 445 F.3d 19, 26 (1st Cir. 2006); Gonzalez-de-Blasini v. Family Dep't, 377 F.3d 81, 85-86 (1st Cir. 2004).

There is no evidence that any of the three committee members was aware that Hatfield was a member of the NPP. Campos did not testify at trial, no evidence linked him with knowledge of Hatfield's political views, and Hatfield could not say whether he was aware of her political affiliation. Rivera testified, but there was a similar evidentiary gap, and Hatfield also could not state if Rivera was aware of her political views. Gonzalez testified that she did not even know Hatfield until the day of the interview. That testimony was not challenged, and Hatfield

admitted that the interview was the first time in her life that she had ever spoken to Gonzalez.[7]

Hatfield argues that because she was "identified" with the prior NPP administration, the committee members had to have been aware of her NPP affiliation. But "the simple fact of [plaintiff's] employment prior to the 2000 election" is insufficient "to put her co-workers and employers on notice of her political inclinations." Aguiar-Carrasquillo, 445 F.3d at 26.

Hatfield argues there was sufficient circumstantial evidence of discrimination to support the verdict. She points out that virtually all of the school directors in Caguas were replaced for the 2001-2002 year, which she says is indicative of a systematic plan to replace those directors associated with the previous NPP administration. Hatfield further argues that this fact has to be evaluated in tandem with the other circumstantial evidence in the case.

The problem is that Hatfield presented no evidence that would allow a jury to infer that the replaced directors in Caguas were generally from the NPP, nor was there evidence permitting the inference that the directors who replaced them were generally from

---

[7] The closest that Hatfield came to demonstrating that any defendant had knowledge of her political affiliation was testimony that Berríos had once met Hatfield while Hatfield was working in a "supervisory" position at the Regional Office. There was no testimony that this position was a trust position, nor was there testimony that Berríos had ever mentioned anything about Hatfield to the members of the committee.

the PDP.  The only admissible evidence on this point was that Hatfield was a member of the NPP, and that Enchauste -- who according to the testimony did not even accept a position -- was a member of the PDP.  Hatfield introduced no evidence suggesting that her qualifications were superior to Enchauste's.  Without more, the fact that a single PDP individual was ranked higher than Hatfield certainly does not provide sufficient evidence of a systematic decision by the committee to give low scores to NPP members.  Further, Hatfield's theory throughout trial was that the committee manipulated the scores on the written and oral questions.  Yet Enchauste also outscored Hatfield on the 30 points assigned to experience and academic background.

Hatfield spends considerable time and energy comparing herself to Roldán.  But there was no admissible evidence of Roldán's political affiliation.

Our law requires more for Hatfield to have a viable claim.  See, e.g., Figueroa-Serrano v. Ramos-Alverio, 221 F.3d 1, 7-8 (1st Cir. 2000) (plaintiffs introduced insufficient evidence that a mass-substitution was politically motivated, as there was no evidence that plaintiffs were actually replaced by individuals from the opposite party); Kauffman v. P.R. Tel. Co., 841 F.2d 1169, 1172-73 (1st Cir. 1988) (plaintiffs could not survive summary judgment in a case involving a massive number of substitutions, occurring immediately after a new party took power, as no evidence

-25-

supported plaintiffs' allegations that the targeted individuals were of one party, while the favored individuals were of another party); cf. Rodríquez-Marín v. Rivera-González, 438 F.3d 72, 76 & n.1, 81 (1st Cir. 2006) (finding sufficient evidence of mass discrimination when there was evidence, inter alia, that NPP individuals, but not a similarly situated PDP official, were targeted for a personnel review); Borges Colón v. Roman-Abreu, 438 F.3d 1, 17 (1st Cir. 2006) (sufficient evidence was presented in a mass substitution case where, inter alia, the targeted employees were generally affiliated with one party, and most of their replacements were generally affiliated with the opposite party).

The remaining pieces of circumstantial evidence in the case are Aldanondo's "pasarle la mano" comment, Aldanondo and Berríos's decisions to de-emphasize the importance of the proposals in the hiring process, the relatively high percentage of points allocated to the subjective interview questions, the timing of the hiring changes, and the fact that Aldanondo, Berríos, and Nieves were PDP members.[8] That evidence is insufficient to establish the committee members' knowledge of party affiliation. Accordingly, since Hatfield did not demonstrate that the committee acted

---

[8] Hatfield's brief does not discuss Berríos's alleged statement to Hatfield that the low interview scores were based on Hatfield's "health problems." Accordingly, we deem any argument based on this statement to be waived. See Playboy Enters., Inc. v. Pub. Serv. Comm'n, 906 F.2d 25, 40-41 (1st Cir. 1990) (explaining that issues not raised in an appellant's opening brief are waived).

-26-

unconstitutionally, there can be no supervisory liability for Aldanondo and Berríos, and we affirm the magistrate judge's decision to grant them judgment as a matter of law on the political discrimination claim.[9]

## IV. THE ARTICLE 1802 CLAIM

On their cross-appeal, defendants level two challenges to the $50,000 jury verdict for plaintiff on the Article 1802 claim. First, they contend that the magistrate judge should have granted the defendants' Rule 50(b) motion for judgment as a matter of law. In the alternative, they argue that the magistrate judge should have stuck with his initial grant of their motion for a mistrial.

On the first issue, defendants' argument has not been preserved for appeal. Before the magistrate judge, the defendants offered only two conclusory sentences[10] on this issue in their post-

---

[9] To the extent Hatfield is making an argument that Berríos and Aldanondo _were_ personally involved in any discrimination, we reject that argument as well. Hatfield's brief could be interpreted as arguing that Berríos and Aldanondo changed the AEP's hiring procedures specifically to disadvantage the incumbent directors -- a group that Hatfield believes was "identified" with the NPP. According to this argument, it would be irrelevant whether the committee members intentionally ranked PDP and NPP members differently; the discrimination would be the very act of altering the AEP's hiring procedures. Yet this argument still fails at the prima facie stage: there is insufficient evidence that the incumbent directors tended to be affiliated with the NPP and that their replacements tended to be affiliated with the PDP.

[10] The sentences were:

> [A]s to the supplemental cause of action brought under Article 1802 of the P.R. Civil Code, the same should also be dismissed

-27-

trial motion.  The argument on this issue was presented so briefly that the magistrate judge did not even realize that the argument had been presented at all.  We have no trouble concluding that the argument cannot now be raised.  See McCoy v. Mass. Inst. of Tech., 950 F.2d 13, 22 (1st Cir. 1991) (explaining that claims cannot be presented on appeal when they have not been adequately developed in the trial court).[11]

This leaves us with defendants' fallback argument for a mistrial.  We review the denial of a motion for a mistrial for manifest abuse of discretion.  United States v. Rullan-Rivera, 60 F.3d 16, 18 (1st Cir. 1995); see also Ramírez v. Debs-Elias, 407 F.3d 444, 447 (1st Cir. 2005).  The granting of a mistrial is a last resort, and the trial court's usual remedy for an impropriety will be to give a curative instruction.  See Rodriguez-Torres v. Caribbean Forms Mfr., Inc., 399 F.3d 52, 63 (1st Cir. 2005).  The

---

because the plaintiff did not prove that the defendants acted negligently.  As a matter of fact, the evidence demonstrated that Mr. Aldanondo and Mrs. Berrios complied with all their duties and followed all the procedures established by the applicable [PRDE internal documents].

[11] Hatfield argues that it is inconsistent for the magistrate judge to have granted the Rule 50(b) motion on the political discrimination claim, while simultaneously denying the Rule 50(b) motion on the Article 1802 claim.  But the magistrate judge decided the Article 1802 claim based on a procedural ground, whereas his decision on the political discrimination claim was based on the merits.  For similar reasons, there is no inconsistency in our affirmance of the magistrate judge's decisions.

normal presumption is that a jury will follow a court's curative instruction.  United States v. De Jesus Mateo, 373 F.3d 70, 73 (1st Cir. 2004).

The magistrate judge did not abuse his discretion in reversing himself and refusing to grant a mistrial in this civil case.  It is true that plaintiff's attorney made improper comments; indeed we find his behavior unacceptable.  Nonetheless, when improprieties were brought to the magistrate judge's attention, the judge was careful to issue curative instructions to the jury.  Many of these curative instructions went beyond simple reminders to the jury that argument of counsel is not evidence.  Cf. United States v. Gonzalez Vargas, 558 F.2d 631, 633 (1st Cir. 1977).

The magistrate judge observed the trial firsthand, and he was in the best position to see the effect of any improper comments and to gauge the adequacy of his curative instructions.  On appeal, our review of the record has provided no basis to disturb the magistrate judge's conclusion.

## V. CONCLUSION

The judgments are affirmed.  No costs are awarded.