# United States Court of Appeals

## For the First Circuit

No. 08-2210

GILBERTO CORTÉS-REYES, ET AL.,

Plaintiffs, Appellees,

v.

SALVADOR SALAS-QUINTANA, in his personal capacity and in his
official capacity as Secretary of the Natural and Environmental
Resources Department of the Commonwealth of Puerto Rico; LOURDES
CABEZUDO, in her personal capacity and in her official capacity
as Human Resources Director of the National & Environmental
Resources Department of the Commonwealth of Puerto Rico,

Defendants, Appellants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO
[Hon. Salvador E. Casellas, U.S. District Judge]

Before
Torruella, Baldock,* and Lipez, Circuit Judges.

Michelle Camacho-Nieves, Assistant Solicitor General, with
whom Irene S. Soroeta-Kodesh, Solicitor General, Leticia Casalduc-
Rabell, Deputy Solicitor General, and Zaira Z. Girón-Anadón, Deputy
Solicitor General, were on brief, for appellants Salas-Quintana and
Cabezudo.
Francisco J. González-Magaz, for appellees.

June 17, 2010

---

*Of the Tenth Circuit, sitting by designation.

**LIPEZ, Circuit Judge**.  This political discrimination lawsuit was filed in January 2002 by thirty-six former Ranger cadets of the Puerto Rico Department of Natural and Environmental Resources ("DNER") pursuant to 42 U.S.C. § 1983.  The cadets alleged that they were summarily terminated due to their political affiliation with the New Progressive Party ("NPP"), in violation of their First Amendment rights, and without notice or a hearing, in violation of their due process rights under the Fourteenth Amendment.  They sued three defendants, Salvador Salas-Quintana, the Secretary of the DNER at the time of their termination, Lourdes Cabezudo, the Director of Human Resources for the DNER, and Francis Nieves, Special Assistant to the Secretary.

Twenty-eight of the plaintiffs convinced a jury that their due process rights had been violated by defendants Salas-Quintana and Cabezudo.  The jury also determined that seven of those twenty-eight plaintiffs had experienced political discrimination.  The jury awarded compensatory damages in the amount of $19,000 to each of the twenty-eight plaintiffs for the violation of their due process rights.  In addition, the jury awarded $19,000 in punitive damages to each of the seven plaintiffs for the violation of their First Amendment rights.  The defendants then moved for judgment as a matter of law or for a new trial; the plaintiffs moved for reinstatement to their positions.  The district court denied both motions.  Defendants Salas-Quintana and

Cabezudo ("the defendants") now appeal the district court's denials of their post-trial motions.[1]

Because we find that the defendants were entitled to qualified immunity on the due process claim, we vacate the jury's finding of a due process violation and the related award of compensatory damages. We affirm the jury's finding of a First Amendment violation and the award of nominal and punitive damages for that violation.

**I.**

We recite some of the relevant facts here in the light most favorable to the verdict for the purpose of background. Omnipoint Holdings, Inc. v. City of Cranston, 586 F.3d 38, 41 (1st Cir. 2009). We provide more details when analyzing the claims of the plaintiffs.

This case, not surprisingly, arises from events following the general elections held in Puerto Rico on November 8, 2000 which resulted in the election of a new governor. See, e.g., Rodríguez-Marín v. Rivera-González, 438 F.3d 72, 75 (1st Cir. 2006). Unlike the previous governor, who had been a member of the NPP, the new governor was a member of the Popular Democratic Party ("PDP"). In January of 2001, a new secretary, Carlos Padín, was appointed by the new PDP administration to head the DNER.

_____

[1] The plaintiffs have not appealed the denial of their request for reinstatement.

Shortly before the election, in August of 2000, the DNER published a job announcement seeking cadets for its Ranger Corps. The Ranger Corps is a law enforcement body whose mission is to protect the environment in Puerto Rico. Rangers are trained in environmental protection. They carry guns and must receive specialized firearms training. Whereas Rangers are so-called "regular employees" under the Puerto Rico government's classification system, cadets are "transitory employees." A cadet becomes a Ranger by meeting certain physical requirements, passing psychological exams, and successfully completing a training program which is provided by the DNER after the cadets are hired.

The twenty-eight remaining plaintiffs in this case ("the plaintiffs") were all hired in late August and early September 2000 after responding to the August 2000 announcement seeking cadets. They were all members of the NPP, hired by the Secretary of the DNER under the NPP administration. As part of the hiring process, the plaintiffs were sent by the DNER to receive psychological testing at INSPIRA, a mental health testing facility. All of the plaintiffs received favorable evaluations. When the new PDP administration was elected in November 2000, the cadets had not yet been trained as Rangers. In December 2000, they were sent to a specially-convened training academy, but the academy was suspended after only a week. Although the cadets were told that their

training would resume after the holidays, the training academy was never reconvened.

Instead, under Secretary Padín, the DNER waffled about the fate of the cadets and whether to resume the training academy, which had been scheduled to reconvene on January 9, 2001. In early 2001, the Secretary asked Ferdinand Lugo-González, the legal advisor to the transition team, to conduct a review of all of the cadets' files, with a specific focus on whether the cadet had or had not been administered the requisite psychiatric and psychological evaluations.

Lugo-González testified that the review was conducted because Secretary Padín was being pressured by the PDP leadership to fire the cadets who had been appointed under the NPP administration. According to Lugo-González, the resulting report, which was written by another member of the transition team, concluded that the cadets were qualified and recommended that the academy be renewed. In response, according to Lugo-González, Secretary Padín determined that he could not legally lay off the cadets. Rather than reconvening the academy, however, the DNER did nothing. Although their initial six-month contracts had not been renewed and their training had never been resumed, the plaintiffs continued to be employed as cadets and to assist the Rangers throughout Puerto Rico. As Lugo-González explained the plaintiffs'

continued presence at the DNER, "the Department had to use these Rangers, they needed them."

In late October 2001, Secretary Salas-Quintana replaced Secretary Padín at the DNER after Padín resigned. During a chance encounter in the DNER building, Salas-Quintana asked Lugo-González why Secretary Padín had not yet dismissed the cadets. He added that he viewed it as his responsibility as Secretary of the DNER to dismiss those "Republicanos."[2] To that end, Salas-Quintana created a committee to once again review the plaintiffs' appointments. Cabezudo was a member of that committee. She testified that she reviewed the personnel file of every cadet. As a result, each plaintiff received a letter in January 2002 stating that as of January 15, 2002, his or her appointment would not be renewed for failure to "comply with the requirement of a[] psychological evaluation." The plaintiffs heard Salas-Quintana say on a radio program that the cadets who had been dismissed would be reinstated if they could produce evidence that they had received psychological evaluations. Despite submitting copies of their psychological evaluations at INSPIRA to the Human Resources Office of the DNER, they were not returned to their positions.

Thirty-six cadets, the original plaintiffs, filed this suit in federal district court on January 25, 2002 pursuant to 42

---

[2] According to the record, "Republicanos" is a term used to refer to members or sympathizers of the NPP, or those who are pro-statehood.

U.S.C. § 1983 against Salas-Quintana, Cabezudo and Nieves in their individual and official capacities. They alleged that the defendants violated their First Amendment rights by summarily terminating them due to their political affiliation, and violated their due process rights when they failed to give them notice or a hearing in connection with their termination.

After a trial, the jury found that Salas-Quintana and Cabezudo had violated the rights of twenty-eight of the original thirty-six plaintiffs.[3] According to the jury, seven plaintiffs had experienced both political discrimination and a violation of their due process rights. The jury found that only the due process rights of an additional twenty-one plaintiffs had been violated. The jury awarded $19,000 in punitive damages on the First Amendment claim and $19,000 in compensatory damages on the due process claim to each of the seven plaintiffs who prevailed on both. It also awarded $19,000 in compensatory damages to each of the twenty-one plaintiffs who prevailed on their due process claims.

The district court denied both the defendants' motion to set aside the verdict pursuant to Fed. R. Civ. P. 50(b) or for a new trial under Fed R. Civ. P. 59, and the plaintiffs' request that the court order their reinstatement. Responding to a request made

---

[3] The district court dismissed all claims against defendant Nieves. That determination has not been appealed. The eight original plaintiffs whose claims were dismissed are not parties to this appeal.

by the plaintiffs immediately after the verdict, the district court awarded $1.00 in nominal damages as to each of the seven plaintiffs who prevailed on their political discrimination claims because it found that such an award was necessary to support the punitive damages award on those claims. This appeal followed.

**II.**

On a motion for judgment as a matter of law, a jury verdict may only be set aside if the court determines that "'the evidence could lead a reasonable person to only one conclusion.'" Acevedo-Diaz v. Aponte, 1 F.3d 62, 66 (1st Cir. 1993) (quoting Hiraldo-Cancel v. Aponte, 925 F.2d 10, 12 n.2 (1st Cir. 1991)). In conducting our review, "we do not evaluate the credibility of the witnesses or weigh the evidence." Rodriguez-Marin, 438 F.3d at 75. Our review of the district court's denial of a motion for judgment as a matter of law is de novo. Mendez-Matos v. Municipality of Guaynabo, 557 F.3d 36, 56 (1st Cir. 2009). We must determine whether, "viewing the evidence in the light most favorable to the verdict, a rational jury could have found in favor of the party that prevailed." Bisbal-Ramos v. City of Mayagüez, 467 F.3d 16, 22 (1st Cir. 2006). Only if the facts and inferences "point so strongly and overwhelmingly in favor of the movant that a reasonable jury could not have [returned the verdict]" will we set it aside. Acevedo-Diaz, 1 F.3d at 66 (quotation marks and citation omitted).

- 8 -

We review the district court's decision to deny the defendants' motion for a new trial for clear abuse of discretion. Acevedo-Luis v. Pagán, 478 F.3d 35, 40 (1st Cir. 2007). The district court, in turn, "may grant such a motion only if 'the verdict is against the clear weight of the evidence, such that letting it stand would result in a miscarriage of justice.'" Id. (quoting Valentín-Almeyda v. Municipality of Aguadilla, 447 F.3d 85, 104 (1st Cir. 2006)).

**III.**

**A. First Amendment Claim**

The First Amendment protects non-policymaking public employees from adverse employment decisions based on their political affiliation. See Gomez v. Rivera Rodriguez, 344 F.3d 103, 110 (1st Cir. 2003) (citing Rutan v. Repub. Party, 497 U.S. 62, 75 (1990)). The freedom to support a particular political party is "integral to the freedom of association and freedom of political expression that are protected by the First Amendment." Welch v. Ciampa, 542 F.3d 927, 939 (1st Cir. 2008).

In order to make out a case of political discrimination, a plaintiff must adduce evidence permitting a rational jury "to conclude that the challenged personnel action occurred and stemmed from a politically based discriminatory animus." Rivera-Cotto v. Rivera, 38 F.3d 611, 614 (1st Cir. 1994). The plaintiff's case must do more than simply juxtapose evidence of unfair treatment

with evidence that an employer's political affiliation differs from the plaintiff's own. Padilla-Garcia v. Guillermo Rodriquez, 212 F.3d 69, 74 (1st Cir. 2000). Instead, there must be evidence from which a jury reasonably may infer that the plaintiff's constitutionally protected conduct (in this instance, an affiliation with the NPP) was a "substantial or motivating factor" behind the plaintiff's discharge. See Welch, 542 F.3d at 936.

In its defense, an employer may seek to discredit the plaintiff's evidence that there was an impermissible motive for his or her dismissal. An employer may also defend against such a suit by producing "enough evidence to establish that the plaintiff's dismissal would have occurred in any event for nondiscriminatory reasons." Acevedo-Diaz, 1 F.3d at 67. This affirmative defense requires that an employer show by a preponderance of the evidence that it would have taken the same action regardless of the plaintiff's political affiliation. Mt. Healthy City School Dist. Bd. of Ed. v. Doyle, 429 U.S. 274, 287 (1977); Padilla-Garcia, 212 F.3d at 77 (1st Cir. 2000). An employer may successfully raise a Mt. Healthy defense by establishing that the plaintiff's activity or status, although it may have been improperly considered, was not the but for cause of the adverse employment action. See Welch, 542 F.3d at 941 (citing Jirau-Bernal v. Agrait, 37 F.3d 1, 4 (1st Cir. 1994). It is the defendant's burden to "persuade[] the factfinder that its reason is credible." Padilla-Garcia, 212 F.3d at 77-78.

- 10 -

In reviewing the district court's denial of defendants' Rule 50(b) motion for judgment as a matter of law, therefore, we would find grounds for reversal only if: (1) the plaintiffs did not introduce sufficient evidence to permit a reasonable jury to conclude that the political animus was a substantial or motivating factor behind the firing, or (2) the record evidence compels the conclusion that the plaintiffs would have been dismissed even without any discriminatory animus that may have existed. See Acevedo-Diaz, 1 F.3d at 67.

1. The plaintiffs' evidence of political discrimination

The plaintiffs presented ample evidence permitting a reasonable jury to conclude that their dismissals were the result of discrimination. The jury heard testimony at trial from the plaintiffs describing the anti-NPP environment at the DNER after the elections. As one cadet put it, after the new administration was elected in November 2000, officers in the Ranger corps discussed how "they were going to throw us out because we came in under the administration of the New Progressive Party." Another cadet explained that a senior officer told him in the presence of other agents "that having them won, that we were going to leave. We had a short time there."

The jury also heard testimony that this hostility towards the NPP cadets permeated the PDP government to the extent that the leadership of the DNER was being pressured to fire the cadets well

before Salas-Quintana took charge and made the decision to dismiss them.  Lugo-González, a legal advisor to Secretary Padín during the transition from the NPP administration to the PDP in early 2001, testified that one of the issues of major concern to the transition committee was the training academy for the Ranger cadets. Secretary Padín had told him "that the Academy was not being continued because those people had been selected under the administration of the New Progressive Party, and that is the only reason.  Because judicially and administrat[ively], the [c]adets were qualified."[4]  Lugo-González testified that it was clear from a meeting at the Governor's office he attended that the leadership of the PDP wanted the cadets to be laid off.  When he communicated this desire to Padín, Padín refused to lay off the cadets because "the only reason that they don't want to renew the Academy is because they had been appointed under the New Progressive Party Administration."[5]

The plaintiffs introduced further testimony that both Salas-Quintana and Cabezudo were fully cognizant of the cadets' political affiliations.  Lugo-González recounted a conversation he

---

[4] Although this testimony might have been excluded on hearsay grounds, no such objection was made by the defendants.

[5] Lugo-González made this statement as part of his response to the question on direct examination, "[w]as there any other source of pressure, concerning the appointment of the cadets?" The defendants' hearsay objection to this testimony was overruled at trial and they have not pressed the issue on appeal.

had with Salas-Quintana in late October 2001 in which Salas-Quintana referred specifically to the cadets' political affiliations, announcing, "I am going to lay all those republicanos off."  Lugo-González testified that Salas-Quintana told him, "now that I'm going to be the Secretary, it is my responsibility, my obligation, my determination, I am the one that is going to go ahead and lay [the cadets] off."  One plaintiff testified that Cabezudo, the Director of Human Resources, refused to give him a copy of his personnel file after his termination, telling him that the department "is now under a new administration, under a new power," and that he should have made the request of "the other secretary who did belong to [his] party."[6]  Cabezudo also admitted that she conducted a review of the cadets' files which, unlike the review conducted under Secretary Padín, concluded that they were not qualified because they had gone to the wrong testing center for psychological testing.  She also oversaw the preparation of the letters informing the plaintiffs that they had been fired.[7]

---

[6] Although Cabezudo denied ever meeting any of the plaintiffs, the jury was free to make the credibility determination favoring the plaintiffs.

[7] The defendants contend that the plaintiffs' showing of a political motive for the plaintiffs' firings is undercut by evidence that some of the cadets who were dismissed were members of the PDP, while others who were not dismissed were members of the NPP.  The defendants direct us to no evidence in support of the former claim.  The defendants direct us to only one page of testimony in support of the latter contention.  That testimony seems to suggest that two cadets who were not fired along with the majority of the class may have been NPP members.  Another portion

In short, based on the totality of the evidence describing the events leading up to the plaintiffs' firing, including the actions and statements of Salas-Quintana and Cabezudo themselves, it was reasonable for the jury to conclude that the defendants shared the prevailing sentiment among PDP officials that the cadets should be fired because of their alliance with the NPP, and acted accordingly.[8]

2. The Mt. Healthy defense

Defendants assert on appeal that they successfully developed their Mt. Healthy defense at trial by establishing, by a preponderance of the evidence, that they would have taken the same action regardless of the plaintiffs' political affiliation with the NPP. They contend that the plaintiffs were dismissed from their positions because they either did not complete psychological evaluations or their evaluations were administered by INSPIRA,

_____

of the testimony, however, indicates that both of those cadets "were also dismissed" at a later date. Taken in the light most favorable to the verdict, the additional information that two NPP cadets were fired later than the plaintiffs does not suggest that the jury was unreasonable in its conclusion that seven of the plaintiffs were fired because of their political affiliation.

[8] The defendants introduce no additional arguments in support of their claim that they were entitled to a new trial beyond their assertion that the jury verdict was against the clear weight of the evidence. As described above, the evidence supporting the political discrimination claim was more than sufficient to support the verdict. The district court did not abuse its discretion when it denied the motion for a new trial.

whose contract with the DNER provided for other psychiatric and psychological services, but not for testing.

The defendants did present evidence at trial that the contract with INSPIRA did not cover psychiatric and/or psychological testing, whereas a contract with another provider, Carribean Medical Testing, did provide for such testing. Cabezudo also testified that she wrote a report at Salas-Quintana's behest in which she identified those cadets who had psychological evaluations from INSPIRA as unqualified for their positions.

To rebut that defense, the plaintiffs presented evidence from José R. Rodríguez-Rosado, who was hired to coordinate the drug and psychiatric testing for the cadets in 2000. Rosado testified that INSPIRA was chosen by Secretary Pagán, the PDP Secretary who preceded Salas-Quintana, and the Comptroller to conduct the tests because it submitted the lowest price estimate. Rosado explained that the DNER requested that INSPIRA evaluate the candidates for Ranger cadets and that, accordingly, INSPIRA performed the evaluations. The plaintiffs corroborated this account, testifying that they were sent to INSPIRA by the DNER for the necessary psychological evaluations. The plaintiffs' INSPIRA evaluations themselves were introduced into evidence.

Hearing this evidence, a reasonable jury could have concluded that the INSPIRA evaluations were precisely the tests that were required by the DNER in accordance with the Ranger bylaws

and that the defendants' claim otherwise was a pretext for the unlawful firing of the plaintiffs. It was the jury's prerogative, after hearing the conflicting accounts of the INSPIRA evaluations, to find that political affiliation, not the use of the wrong psychological testing center, was the "but-for" cause of the plaintiffs' dismissal. The evidence did not compel the jury to find that the defendants were entitled to prevail on their Mt. Healthy defense as a matter of law.

## B. Due Process and Qualified Immunity

The defendants argue that no reasonable jury could have found that the plaintiffs' due process rights had been violated because they did not have an entitlement to retain their positions as cadets. Without such an entitlement, the plaintiffs would not have a valid claim under the due process clause, which only protects government employees who have a property interest in continued employment. Costa-Urena v. Segarra, 590 F.3d 18, 26 (1st Cir. 2009). We need not reach the merits of this property interest argument because the defendants were entitled to qualified immunity from suit on the due process claim.[9]

---

[9] Although the district court did not address this qualified immunity claim in its opinion denying the defendants' motion for judgment as a matter of law, the defendants raised their claim of qualified immunity in both their 50(a) and 50(b) motions as well as on appeal. Thus, it is properly before us. We review the implicit denial of qualified immunity de novo. Rodríguez-Marín, 438 F.3d at 84.

- 16 -

Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 129 S. Ct. 808, 815 (2009) (quotation marks and citation omitted). The qualified immunity analysis has two parts. A court must decide whether the facts shown by the plaintiff make out a violation of a constitutional right and whether the right was "clearly established" at the time of the alleged violation by the defendant. Id. at 815-16; Maldonado v. Fontanes, 568 F.3d 263, 269 (1st Cir. 2009).[10]

Supreme Court doctrine had required that we begin our qualified immunity analysis by determining whether the plaintiff has shown a constitutional violation. See Saucier v. Katz, 533 U.S. 194, 201 (2001) (holding that a court considering qualified immunity must decide, as a "threshold question," whether the facts alleged show the violation of a constitutional right). Recently, however, the Court relaxed that requirement, allowing us to bypass the initial step in certain circumstances. See Pearson, 129 S. Ct. at 818-19; Maldonado, 568 F.3d at 270. The Court agreed that the

---

[10] The district court erroneously submitted the question of qualified immunity to the jury. Whether defendants are entitled to qualified immunity "is a legal question for the court to decide." Rodríguez-Marín, 438 F.3d at 83. The jury's role is to "determine any preliminary factual questions" so that the court can determine the "legal issue of the official's reasonableness." Id. at 83-84.

underlying principle of "encouraging federal courts to decide unclear legal questions in order to clarify the law for the future 'is not meaningfully advanced . . . when the definition of constitutional rights depends on a federal court's uncertain assumptions about state law.'" Pearson, 129 S.Ct. at 819 (quoting Egolf v. Witmer, 526 F.3d 104, 109-111 (3d Cir. 2008)). This is a case in which any conclusions we might draw about the relevant Commonwealth law would be uncertain at best. Moreover, as we explain below, that very uncertainty is critical to our analysis of the clearly established prong of the qualified immunity doctrine.

Property interests subject to due process protection are delineated "by existing rules or understandings that stem from an independent source such as state law." Bd. of Regents v. Roth, 408 U.S. 564, 577 (1972). In order to create a property interest, that independent source must "give the individual a legitimate claim of entitlement to some sort of benefit." Hatfield-Bermudez v. Aldanondo-Rivera, 496 F.3d 51, 59 (1st Cir. 2007). Whether the plaintiffs had a clearly-established property interest in their employment as cadets is therefore a question of Puerto Rico law. See Costa-Urena, 590 F.3d at 27.

The law is "clearly established" if courts have ruled that "materially similar conduct was unconstitutional," or if there is a previously identified general constitutional principle that applies "with obvious clarity to the specific conduct at issue."

- 18 -

Jennings v. Jones, 499 F.3d 2, 16 (1st Cir. 2007). In other words, a right is clearly established if a reasonable official is on clear notice that what he or she is doing was unconstitutional. Costa-Urena, 590 F.3d at 29. It was the plaintiffs' burden to demonstrate that the law was clearly established in early 2002, when the termination took place. See Davis v. Scherer, 468 U.S. 183, 197 (1984); Horta v. Sullivan, 4 F.3d 2, 13 (1st Cir. 1993).

As we have had occasion to observe in the past, translated Puerto Rico law is both sparse and contradictory on the question of the property interest in continued employment of transitory government employees. Hatfield-Bermudez, 496 F.3d at 60 (noting that "it is not entirely clear" what the Puerto Rico Supreme Court's current position is on whether a non-career government employee has a legitimate expectation of permanent employment). The plaintiffs cite two cases on point available to us in English translation. The plaintiffs do not cite or provide any additional cases on the question, nor has our independent research revealed any additional translated cases.

In the earlier of the two available opinions, the Puerto Rico Supreme Court "indicated that there may be certain circumstances in which a transitory employee could have a legitimate expectancy of contract renewal." Id. at 60 (emphasis in original)(citing Lupiáñez de González v. Cruz, 5 P.R. Offic. Trans. 966 (1977) (finding that a non-career employee who had been told

- 19 -

that a permanent position was being created for her had a right to due process before being terminated)). In the latter of the cases, however, the Puerto Rico Supreme Court held that a "transitory employee" has "a job retention expectancy <u>only</u> during the term of the appointment." <u>Dep't of Natural Res.</u> v. <u>Correa</u>, 18 P.R. Offic. Trans. 795, 804 (1987). The Court stated that "[a] person who has a transitory appointment, knowing that it expires at the end of the period for which it is given, cannot validly claim that he had a real expectancy that this type of appointment would offer him a permanent job status or the right to have the same constantly renewed." <u>Id.</u> at 806.

In the face of two cases that seem to give opposing answers to the question whether a transitory government employee has an entitlement to his or her continued employment, the plaintiffs do not explain how the law clearly established that conduct "materially similar" to that of the defendants in this case was unconstitutional at the time the plaintiffs were fired.[11] The plaintiffs were hired under bylaws that required that they receive training, and the successful completion of that training would result in their becoming non-transitory employees.[12] However, they

---

[11] There may be additional relevant cases, but the plaintiffs have not cited them nor have we been provided with translations.

[12] There was a factual dispute at trial over the implications of the Ranger bylaws. "When, as here, the defendants appeal from a denial of qualified immunity after a jury verdict has been rendered, the evidence is construed in the light most hospitable to

were also indisputably transitory employees whose term had expired when they were discharged. Thus, their circumstances could be analogized either to Lupiáñez or Correa. We are unable to say that one case or the other clearly governs. Qualified immunity, therefore, shielded the defendants from the due process claims of the plaintiffs.[13]

**IV.**

Although the defendants do not contest on appeal the jury's award of damages (thereby relying for success on their challenges to liability), we must say a few words about the damages awards to avoid any misunderstanding about the effect of our liability determinations on those awards. First, we note that the district court did not have to award $1.00 in nominal damages to validate the jury's award of punitive damages for the violation of

the party that prevailed at trial, and deference is accorded the jury's discernible resolution of disputed factual issues." Guillemard-Ginorio, 585 F.3d at 525 (internal quotation marks and citation omitted). We therefore read the cadet bylaws to support the proposition that the cadets would become Rangers so long as their training was successfully completed.

[13] The defendants also argue that they were entitled to qualified immunity from suit on the political discrimination claim. They provide no support for that argument, beyond the claim that the evidence was "insufficient to establish Plaintiffs' prima facie case." Having determined that the jury reasonably found that Salas-Quintana and Cabezudo were motivated by political animus when they fired the cadets, we need not tarry long over this claim. "[I]t is clearly established, and was at the time of the events in question, that terminating a non-policy-making employee based on political affiliation violates the First Amendment." Costa-Urena, 590 F.3d at 21.

the First Amendment rights of seven of the plaintiffs.  We have recently determined that in a section 1983 action, a jury may properly award punitive damages even if it awards no nominal or compensatory damages.  De Jesús Nazario v. Morris Rodríguez, 554 F.3d 196, 205 (1st Cir. 2009).[14]  Nevertheless, as noted, the nominal damages award for the First Amendment violations are unchallenged and we see no reason to disturb them.[15]

Second, because of our conclusion that the defendants were entitled to qualified immunity on the due process claims, we

---

[14] The district court did not have the benefit of our recent decision in De Jesús Nazario, in which we held definitively that our earlier holding in Kerr-Selgas v. American Airlines, 69 F.3d 1205 (1st Cir. 1995), on which the district court relied, did not apply to section 1983 actions.  De Jesús Nazario, 554 F.3d at 205.

[15] Nominal damages are available in a § 1983 action for the violation of a procedural due process right even without a corollary finding of injury or an award of compensatory damages. Carey v. Piphus, 435 U.S. 247, 266 (1978).  Several circuits have held that, "although the Supreme Court's decision in Carey involved nominal damages after a procedural due process violation, nominal damages are similarly appropriate in the context of a First Amendment violation."  KH Outdoor, LLC v. City of Trussville, 465 F.3d 1256, 1261 (11th Cir. 2006); see also Familias Unidas v. Briscoe, 619 F.2d 391, 402 (5th Cir. 1980) (nominal damages for violation of First Amendment rights); Draper v. Combs, 792 F.2d 915, 921-22 (9th Cir. 1986) (nominal damages for violation of either procedural or substantive constitutional right); Risdal v. Halford, 209 F.3d 1071, 1072 (8th Cir. 2000) (nominal damages for First Amendment rights).  Given the absence of a challenge to the nominal damages award, we see no need to address the merits of that question here.  Procedurally, if a jury in a case brought pursuant to 42 U.S.C. § 1983 finds a violation of the plaintiff's constitutional rights, but fails to award compensatory damages, a plaintiff "may ask the trial court for nominal damages on the occasion of, or immediately after, the return of the verdict." Campos-Orrego v. Rivera, 175 F.3d 89, 98-99 (1st Cir. 1999).  Such a procedure was followed in this case.

must vacate the jury's award of compensatory damages to the twenty-eight prevailing plaintiffs for the violation of their rights under the due process clause.[16] We affirm the award of punitive and nominal damages to the seven plaintiffs whose First Amendment rights were violated.[17]

## V.

For the aforementioned reasons, we <u>affirm</u> the judgment of the district court on the political discrimination claims, and the award of nominal and punitive damages to the plaintiffs who prevailed on their political discrimination claims. We <u>vacate</u> the judgment on the due process claims of all plaintiffs and the award

---

[16] Since the injury in this case for a due process violation and a First Amendment violation would seem to be the same - the loss of a job - it does seem odd that the jury awarded compensatory damages on the due process claim but not on the First Amendment claim. The district court speculated that the jury might have chosen that outcome because of the court's admonition in its instructions that the jury could not award double damages for the same injury. With a properly structured verdict form, the jury might have been able to indicate an award of compensatory damages for the First Amendment claim and the due process claim without violating the rule on double damages. However, such a verdict form was not submitted to the jury.

[17] The requirement for an award of punitive damages in an action pursuant to § 1983 is rigorous. <u>See</u> <u>Méndez-Matos</u> v. <u>Municipality of Guaynabo</u>, 557 F.3d 36, 48 (1st Cir. 2009) (holding punitive damages cannot be assessed in an action under § 1983 unless the plaintiff proves that the "defendant 'discriminate[d] in the face of a perceived risk that its actions [would] violate federal law'") (quoting <u>Kolstad</u> v. <u>Am. Dental Ass'n</u>, 527 U.S. 526, 536 (1999)). As noted, however, the appellants did not argue on appeal that this requirement was not met.

of compensatory damages based on the due process claims.  Each side shall bear its own costs on this appeal.

So Ordered.