# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 10-2588

_____

| | | |
|---|---|---|
| Teresa R. Wagner, | * | |
| | * | |
| Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Southern District of Iowa. |
| Carolyn Jones, Dean Iowa college | * | |
| of Law (in her official and individual | * | |
| capacities), | * | |
| Appellee. | * | |

_____

Submitted: June 16, 2011
Filed:  December 28, 2011

_____

Before MURPHY and SMITH, Circuit Judges, and SCHREIER,[1] District Judge.

_____

SCHREIER, District Judge.

Teresa Wagner appeals the district court's grant of summary judgment dismissing her 42 U.S.C. § 1983 suit against Carolyn Jones, who was then the Dean of the University of Iowa's College of Law. Wagner alleges that Dean Jones discriminated against her in violation of her First Amendment rights of political belief and association when Wagner was not hired to be a full-time Legal Analysis, Writing, and Research (LAWR) instructor or a part-time adjunct LAWR instructor. The district

_____

[1] The Honorable Karen E. Schreier, Chief United States District Judge for the District of South Dakota, sitting by designation.

court granted summary judgment to Dean Jones on her official capacity and individual capacity claims. On appeal, Wagner only challenges the grant of summary judgment to Dean Jones in her individual capacity based on qualified immunity. We reverse the district court's grant of summary judgment based on qualified immunity.

A grant of summary judgment on the basis of qualified immunity is reviewed de novo. Borgman v. Kedley, 646 F.3d 518, 522 (8th Cir. 2011). The evidence is viewed in the light most favorable to the nonmoving party with all reasonable inferences being drawn in her favor. Id. Summary judgment is only appropriate if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2).[2] In the context of a First Amendment claim, we must "make an independent examination of the whole record" to assure ourselves that "the judgment does not constitute a forbidden intrusion on the field of free expression." Doe v. Pulaski Cnty. Special Sch. Dist., 306 F.3d 616, 621 (8th Cir. 2002) (en banc).

## I. Background

Wagner, a registered Republican, has actively advocated for socially conservative causes. Wagner graduated from the University of Iowa College of Law (University) in 1993. Two years later, Wagner moved to Washington, D.C., where she worked with the National Right to Life Committee, which opposes abortion and euthanasia, and the Family Research Council, which advocates for conservative social views. Wagner also taught Advanced Legal Research, Writing & Analysis at George Mason University School of Law in Washington, D.C. for two years.

---

[2] While Federal Rule of Civil Procedure 56 changed in 2011, we apply the rule as it existed at the time the district court granted summary judgment.

The law school faculty at the University is viewed as being liberal. Only one out of 50 professors is a registered Republican.

In August of 2006, Wagner returned to the University and worked as a part-time associate director in the University's writing center. That same month, the University posted an advertisement announcing an opening for two full-time LAWR instructors. The advertisement specifically sought candidates with prior successful teaching experience. Wagner applied for the LAWR position on October 4, 2006. Wagner listed on her resume her work with the National Right to Life Committee and the Family Research Council.

The University's Faculty Appointments Committee, which reviews applications and invites candidates for an initial interview with the Committee, reviewed Wagner's application. The Committee members were Mark Janis, the Committee chair, Dean Jones, and four other professors. On October 21, 2006, Janis e-mailed Wagner to unofficially inform her that her application was well received by the Committee.

On November 7, 2006, the Committee invited Wagner for an initial interview. During this interview, Professor N. William Hines, a Committee member, asked Wagner what differences she perceived between writing and analysis. Wagner replied that she understood the writing center's focus was on writing and LAWR instructors taught writing and analysis. On November 17, 2006, Janis e-mailed Wagner and told her that the Committee "enjoyed meeting with you and we're very enthusiastic about your candidacy for a full-time position in the LAWR Program." From the fifty applicants, the Committee selected five candidates, including Wagner, for a second, full-day interview. Three of those candidates, including Wagner, interviewed for the position.

In January of 2007, Wagner met with then-Associate Dean John Carlson[3] to discuss her full-day interview, which was scheduled for Wednesday, January 24, 2007. Associate Dean Carlson explained the interview process. Wagner informed Associate Dean Carlson that she had previously gone through a similar interview process. Associate Dean Carlson asked where and Wagner told him Ave Maria School of Law, where she received an offer for a tenure-track law school teaching position. Associate Dean Carlson suggested to Wagner that she conceal this fact during the interview process because Ave Maria is viewed as a conservative school.

Wagner also informally met with prior Associate Dean Eric Andersen and asked him if the faculty would hold her conservative political views against her in the hiring process. Associate Dean Andersen answered that he did not know. Associate Dean Andersen spoke with Dean Jones before Wagner's full-day interview and relayed Wagner's concerns that her political beliefs might be a factor in the hiring decision.

Wagner had her full-day interview on January 24, 2007, which included a presentation or "job talk" to the full faculty, interviews with students and selected faculty, and a private interview with Dean Jones. During the interview with the faculty, Professor Randall Bezanson asked Wagner if she struggled in distinguishing between a document's writing and its analysis. Wagner responded that she understood the difference between writing and analysis and that documents can be evaluated for both their form (writing) and content (analysis). Wagner and Professor Bezanson elaborated on these distinctions during the interview.

Professor Todd Pettys asked Wagner whether analysis or writing was more important to the LAWR position. Wagner responded that both were important to the job. When Professor Pettys later asked Wagner if she had to choose between writing

_____

[3] Eric Andersen was Associate Dean for the fall 2006 semester and John Carlson became Associate Dean for the spring 2007 semester.

or analysis as to which was more important, Wagner responded that the question was unfair because both were important, but if she had to choose, she would pick writing. She further noted that all classes at the University teach legal analysis.

Wagner's notes from the job talk make two references to legal analysis. First, her notes state that she planned to use a textbook entitled *Legal Writing and Analysis*, which she had previously used at George Mason. Second, Wagner's notes reflect that she would ask students to absorb and analyze new information.

Seven faculty members complimented Wagner on her job talk. Professor Sheldon Kurtz e-mailed at 2:59 p.m. on January 24, 2007, and stated, "Great. Lets [sic] hire her." At 4:28 p.m. that same day, Ted Potter, the University's Reference Librarian, noted that Wagner was not as insightful as some other candidates but agreed that she should be hired:

> Teresa is enthusiastic about working with law students to help them become good legal writers. She has teaching and writing experience, and is familiar with the law school. She made some good comments about how she would teach LAWR . . . [h]er strategies for LAWR were practical . . . I feel Teresa is well-qualified for the position and I would recommend her.

Ellen Jones, a reference librarian and instructor in the writing program, said that both Wagner and Matt Williamson should be hired. Professors Peggy Smith and Michelle Falkoff told Wagner at a faculty dinner later that night that her presentation had gone well. Associate Dean Carlson and Associate Dean Andersen both supported hiring Wagner.

Student feedback from Wagner's interview was also positive. The students gave Wagner the highest possible ratings and ranked her higher than Williamson.

On January 25, 2007, the faculty discussed the applicants with Dean Jones present. The faculty voted to recommend that Dean Jones only hire Williamson, even though Dean Jones had informed the faculty that she could hire two full-time LAWR instructors. Williamson was an adjunct LAWR instructor, had never practiced law, had no legal publications, and had no prior successful teaching experience. Williamson portrayed himself as a liberal to other employees at the Writing Center. During the January 25 meeting, the faculty did not consider Wagner for an adjunct position.

On January 26, 2007, Janis informed Wagner via e-mail that the University would not be hiring her. Wagner learned from Associate Dean Carlson on January 29, 2007, that Professor Bezanson had been the primary, vocal opponent to hiring her. In his deposition, Professor Bezanson could not recall whether Wagner's politics were discussed before the faculty voted, but he remembers some person mentioning that Wagner was conservative during the meeting. Professor Bezanson testified that Wagner's politics were possibly discussed after the faculty voted not to hire Wagner. Professor Bezanson had clerked for Justice Blackmun during the time Roe v. Wade was written, has written tributes to Justice Blackmun and his abortion jurisprudence, and has published legal articles advocating a pro-choice viewpoint on abortion. In contrast, Wagner's legal career has focused, in part, on protesting abortion and the cases that established a constitutional right to abortion.

On January 26, 2007, at 4:55 p.m., Associate Dean Carlson sent Dean Jones an e-mail stating that Wagner had expressed an interest in the summer LAWR program. Associate Dean Carlson questioned whether Wagner's politics had played a role in the faculty's hiring decision and whether her politics would play a role in future hiring decisions:

> I don't know whether you have yet spoken to Teresa about the outcome of the faculty meeting. If not, there is something you should

know–yesterday I received an email from Teresa (which I only just read) in which she indicated a willingness to teach the LAWR program in the summer. I don't know where Matt Williamson stands on this (he has not replied to my email inviting him to speak with me about summer teaching), and it may emerge that we would like to use Teresa during the summer. The problem is that I don't understand the significance of the faculty's unwillingness to vote on approving Teresa as an Adjunct. It seemed that there might be an undercurrent of opposition even to that.

Frankly, one thing that worries me is that some people may be opposed to Teresa serving in any role in part at least because they so despise her politics (and especially her activism about it). I hate to think that is the case, and I don't actually think that, but I'm worried that I may be missing something.

In any event, I think that we need to move fairly soon on this if we expect to have Teresa available as an adjunct either this summer or next fall. I believe that she may begin looking for more permanent and substantial work outside the College of Law after she learns that she will not receive an LAWR position.

At 5:14 p.m. that same day, Janis informed Wagner via an e-mail that the University would only be hiring one full-time LAWR instructor and that Wagner had not been selected. In that e-mail, Janis asked Wagner if she would be willing to work as an adjunct LAWR instructor because the law school would be filling the second LAWR opening with adjunct appointments:

During the meeting, a number of faculty expressed the hope that you might be willing to be considered for a possible adjunct position. Dean Jones has asked me to follow up with you to inquire whether, indeed, that would be something that might be of interest to you. If it is of potential interest (and I hope it is!), please let me know, so that I can inform the committee to keep you under consideration.

On February 25, 2007, the University provided Wagner with a "Hiring Justification Summary" for the faculty's recommendation to hire Williamson. The summary stated that Wagner's interview was less successful than Williamson's interview possibly because the faculty perceived Wagner to be less familiar with the analysis component of the University's LAWR program. The faculty again encouraged Wagner to apply for an adjunct position: "It was observed that Ms. Wagner might benefit from an opportunity to teach as an Adjunct in the College's program so that she may gain experience in (and assess her interest in) that important [analysis] component of the program."

Wagner did pursue an adjunct position. On February 27, 2007, Janis sent an e-mail to the Committee stating that Wagner had expressed interest in the adjunct position and that he wanted to forward her name to the faculty for consideration at the next faculty meeting. Janis received unanimous support from the Committee members who responded to his e-mail. Wagner's name was forwarded to the faculty for consideration. Wagner did not receive an interview for the adjunct LAWR position.

On March 22, 2007, the faculty voted not to hire Wagner as a part-time adjunct LAWR instructor and provided no explanation for their decision. Associate Dean Carlson informed Wagner on March 23, 2007, that she had been rejected as an adjunct instructor and that Professor Bezanson had been the primary opponent to her appointment. Associate Dean Carlson also told Wagner that a minority of faculty members can block a vote, and he suggested that she not apply again for an LAWR position.

Instead of hiring Wagner and pursuant to the faculty's recommendations, Dean Jones hired Steve Moeller and Dawn Anderson as part-time adjuncts. Both had served as adjunct instructors during the fall 2006 semester. Neither Moeller nor Dawn Anderson had had prior law school teaching experience. In fact, Moeller, who was Professor Bezanson's research assistant, had just graduated from law school. Because

they both had received low student evaluation scores for the fall 2006 semester–in the low twos on a scale of one to five–neither had been considered qualified for the full-time position.

In December of 2008, Wagner had a discussion with Professor David Baldus. Wagner worked with Baldus and assisted him in editing his legal publications. Baldus told Wagner that he was surprised she had not been hired as an adjunct because adjunct candidates usually come recommended to the faculty from the Committee. He had never heard of the faculty rejecting a candidate who had been recommended by the Committee.

Wagner applied, and was rejected, four additional times for an adjunct position: January 2007, March 2007, June 2008, and January 2009. The University did not grant Wagner an interview for any of the adjunct positions.

Wagner brought a § 1983 suit against Dean Jones in her individual and official capacities in January of 2009. The district court granted summary judgment in favor of Dean Jones. The only issue on appeal is whether Dean Jones, in her individual capacity, is entitled to qualified immunity on Wagner's First Amendment discrimination claim.

## II. Discussion

Section 1983 provides a civil cause of action against any person who, under color of state law, causes a deprivation of the rights, privileges, or immunities secured by the Constitution and laws of the United States. 42 U.S.C. § 1983; McRaven v. Sanders, 577 F.3d 974, 979 (8th Cir. 2009). In an individual capacity suit under § 1983, a plaintiff seeks to impose personal liability on a state actor for actions taken under color of state law. Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690 n.55 (1978).

When a state actor is sued in her individual capacity, she can plead an affirmative defense of qualified immunity. Serna v. Goodno, 567 F.3d 944, 952 (8th Cir. 2009). "In analyzing qualified immunity, we ascertain (1) whether the facts alleged, construed in the light most favorable to the nonmoving party, establish a violation of a constitutional right, and (2) whether such right was clearly established so that a reasonable [dean] would have known her actions were unlawful." El-Ghazzawy v. Berthiaume, 636 F.3d 452, 456 (8th Cir. 2011) (citing Doe v. Flaherty, 623 F.3d 577, 583 (8th Cir. 2010)). The court has the discretion to choose which prong to analyze first. Pearson v. Callahan, 555 U.S. 223, ___, 129 S. Ct. 808, 821-22 (2009) (overruling the mandatory two-prong analysis established in Saucier v. Katz, 533 U.S. 194 (2001)).

A.     Constitutional Violation

The threshold question is whether the facts, taken in the light most favorable to Wagner, show that Dean Jones's actions violated a constitutional right. Sexton v. Martin, 210 F.3d 905, 909 (8th Cir. 2000). Wagner alleges that Dean Jones violated her First Amendment rights of political belief and association when Wagner was not hired for any of the LAWR positions.

The First Amendment is binding on the states through the Fourteenth Amendment. Healy v. James, 408 U.S. 169, 181 (1972). " '[P]olitical belief and association constitute the core of those activities protected by the First Amendment.' " Rutan v. Republican Party of Ill., 497 U.S. 62, 69 (1990) (quoting Elrod v. Burns, 427 U.S. 347, 356 (1976)). In Rutan, the United States Supreme Court extended Branti v. Finkel, 445 U.S. 507 (1980) and Elrod v. Burns, 427 U.S. 347 (1976) and held that the First Amendment prohibits a state from basing hiring decisions on political beliefs or associations with limited exceptions for policymaking and confidential positions. Rutan, 497 U.S. at 79. The state can neither directly nor

indirectly interfere with an employee's or potential employee's rights to association and belief. Id. at 78.

Academic freedom is a "special concern of the First Amendment." Keyishian v. Bd. of Regents of Univ. of N.Y., 385 U.S. 589, 603 (1967). "No more direct assault on academic freedom can be imagined than for the school authorities to [refuse to hire] a teacher because of his or her philosophical, political, or ideological beliefs." Bd. of Regents v. Roth, 408 U.S. 169, 187-88 (1972) (Douglas, J., dissenting). But this court has recognized that respect for the "singular nature of academic decision-making" is also warranted because courts "lack the expertise to evaluate tenure decisions or to pass on the merits of a candidate's scholarship." Okruhlik v. Univ. of Ark., 395 F.3d 872, 879 (8th Cir. 2005). The Supreme Court has also emphasized the respect due to academic judgment. See Regents of Univ. of Mich. v. Ewing, 474 U.S. 214, 225 (1985) ("When judges are asked to review the substance of a genuinely academic decision, . . . they should show great respect for the faculty's professional judgment."). Thus, judicial review of such decisions is limited to whether the "decision was based on a prohibited factor." Brousard-Norcross v. Augustana Coll. Ass'n, 935 F.2d 974, 976 (8th Cir. 1991).

Wagner has stated a claim of First Amendment political discrimination rather than a claim of retaliation because it is based on her status or affiliation. See Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 63 (2006) (reasoning that in the Title VII context the discrimination "provision seeks to prevent injury to individuals based on who they are, *i.e.,* their status. The antiretaliation provision seeks to prevent harm to individuals based on what they do, *i.e.,* their conduct."). We have considered multiple First Amendment retaliation claims in the past. See, e.g., Hughes v. Stottlemyre, 506 F.3d 675, 677-78 (8th Cir. 2007) (former state highway patrol sergeant alleged that his employer retaliated against him by demoting him and transferring him in violation of his First Amendment speech rights after he opposed changes in the highway patrol's policy); Davison v. City of Minneapolis, Minn., 490

F.3d 648, 651 (8th Cir. 2007) (fire captain who spoke out against a city's budget plan brought a § 1983 claim alleging First Amendment retaliation after she was repeatedly denied promotions); Altonen v. City of Minneapolis, Minn., 487 F.3d 554, 558 (8th Cir. 2007) (police investigator who supported a different police chief than the one ultimately appointed brought a § 1983 suit based on First Amendment retaliation after she was reassigned). But this is our first opportunity to address a political discrimination claim.

The First Circuit Court of Appeals, which has extensive case law in the area of political discrimination claims, applies the following test to nonpolicymaking employees:

> In political discrimination cases, nonpolicymaking employees have the threshold burden to produce sufficient direct or circumstantial evidence from which a rational jury could find that political affiliation was a substantial or motivating factor behind the adverse employment action. At that point the employer must articulate a nondiscriminatory basis for the adverse employment action and prove by a preponderance of the evidence that it would have been taken without regard to plaintiff's political affiliation.

Rodriguez-Rios v. Cordero, 138 F.3d 22, 24 (1st Cir. 1998). See also Morales-Tanon v. Puerto Rico Elec. Power Auth., 524 F.3d 15, 19 (1st Cir. 2008 ) (same) and Hatfield-Bermudez v. Aldanondo-Rivera, 496 F.3d 51, 61 (1st Cir. 2007) (same). This is an extension of the substantial or motivating factor test articulated by the United States Supreme Court for First Amendment retaliation claims in Mount Healthy City School District v. Doyle, 429 U.S. 274, 287 (1977). Other circuits have employed a similar test. See, e.g., Hall v. Babb, 389 F.3d 758, 762 (7th Cir. 2004); Stephens v. Kerrigan, 122 F.3d 171, 181 (3d Cir. 1997).

In Hughes v. Stottlemyre, 506 F.3d 675 (8th Cir. 2007), we established a similar test for First Amendment retaliation claims. Id. at 678-79. A plaintiff alleging First

Amendment retaliation must first make a prima facie showing that (1) she engaged in conduct protected by the First Amendment; (2) she suffered an adverse employment action; and (3) the protected activity was a substantial or motivating factor in the employer's decision to take the adverse employment action. Id. at 678. If a plaintiff makes this prima facie showing, then "a presumption of retaliation arises and the burden shifts to the defendant to advance a legitimate reason for the employment action." Id. at 679.

The Mt. Healthy burden-shifting analysis differs from the McDonnell Douglas burden-shifting analysis, which is used in Title VII discrimination cases, because

> under the Mt. Healthy burden-shifting mechanism applicable to a First Amendment political discrimination claim, the burden of persuasion itself passes to the defendant-employer once the plaintiff produces sufficient evidence from which the fact finder reasonably can infer that the plaintiff's protected conduct was a "substantial" or "motivating" factor behind her dismissal. Accordingly, once the burden of persuasion shifts to the defendant-employer, the plaintiff-employee will prevail unless the fact finder concludes that the defendant has produced enough evidence to establish that the plaintiff's dismissal would have occurred in any event for nondiscriminatory reasons.

Acevedo-Diaz v. Aponte, 1 F.3d 62, 67 (1st Cir. 1993). We find the First Circuit's test on First Amendment discrimination to be well reasoned, based on Supreme Court precedent, and utilized in a similar manner by other circuits. Thus, we adopt the test as set forth above.

      1.     Prima Facie Showing

The parties do not dispute that Wagner's political affiliation with the Republican Party and her work on behalf of socially conservative organizations is protected by the First Amendment. It also is undisputed that Wagner was not hired for

either the full-time position or the part-time adjunct LAWR positions. If a state actor refuses to hire an individual because of her political associations, then the individual has suffered an adverse employment action. See Rutan, 497 U.S. at 77 (reasoning that the "denial of a state job is a serious deprivation."). Thus, Wagner suffered an adverse employment action. Furthermore, it is undisputed that none of the positions were policymaking positions.

Next, we examine whether Wagner's political beliefs and associations were a substantial or motivating factor in Dean Jones's decision not to hire her. A substantial or motivating factor can be proven through either direct or indirect evidence. Davison, 490 F.3d at 655 n.5. A plaintiff need only prove that the employer's discriminatory motive played *a part* in the adverse employment action. See id. at 657 (reasoning that plaintiff presented sufficient evidence for jury to infer that failure to promote was motivated *in part* by his constitutionally protected activities).

Wagner presented evidence that only one out of 50 faculty members at the University is a registered Republican. She, on the other hand, is a registered Republican and a social conservative who has worked for socially conservative organizations.

Prior to her interview, Wagner was warned by Associate Dean Carlson to conceal the fact that she had received a similar tenure-track job offer from Ave Maria School of Law, which was perceived to be a conservative school. Former Associate Dean Andersen told Dean Jones prior to Wagner's interview that Wagner was concerned that her conservative political views might be held against her during the hiring process.

During the January 25, 2007, faculty meeting, which Dean Jones attended, someone mentioned that Wagner holds conservative beliefs. It is disputed as to

whether this occurred before or after the faculty voted to recommend that Wagner not be hired and that Williamson, a self-portrayed liberal, be hired.

The day after the faculty vote, Associate Dean Carlson sent Dean Jones an e-mail inquiring whether Wagner's politics had been considered by the faculty when they voted not to hire Wagner.

Even though Wagner was encouraged to and did apply for part-time adjunct positions, Wagner was not given an interview and the faculty voted not to hire her. The two individuals hired for the adjunct positions had less prior teaching experience than Wagner and low student evaluation scores.

When the facts are viewed in their totality with all reasonable inferences being drawn in favor of Wagner, we believe that Wagner has presented sufficient evidence for a fact finder to infer that Dean Jones's repeated decisions not to hire Wagner were in part motivated by Wagner's constitutionally protected First Amendment rights of political belief and association.

2.    Mt. Healthy Defense

Because Wagner has met her prima facie burden, the burden now shifts to Dean Jones to show that she would have made the same hiring decisions regardless of Wagner's political affiliations and beliefs. Davison, 490 F.3d at 658. This is "commonly referred to as the Mt. Healthy defense." Padilla-Garcia v. Guillermo Rodriguez, 212 F.3d 69, 74 (1st Cir. 2000) (citing Mt. Healthy, 429 U.S. at 287).

Dean Jones's proffered reason for not hiring Wagner for the full-time position was that she always adopts the faculty's recommendation, and the faculty did not recommend hiring Wagner because Wagner did not understand the analysis portion of the LAWR program. When Professor Steven Burton asked Wagner about the

-15-

relationship between teaching legal analysis and legal writing, Dean Jones alleges that Wagner responded it would be the job of doctrinal faculty, not her, to teach legal analysis. In response to follow-up questions about whether Wagner would teach legal analysis, Dean Jones alleges that Wagner continued to state that she would not teach analysis. The faculty's hiring justification summary noted that they perceived Wagner to be less familiar with the analysis portion of the LAWR program and, as a result, she was viewed less favorably than Williamson.

Dean Jones's proffered reason for not hiring Wagner for the part-time adjunct positions was that the faculty did not recommend hiring her and she always follows their recommendation. No further explanation was given.

Wagner disputes Dean Jones's proffered reasons. "In a political discrimination case, the plaintiff may discredit the proffered nondiscriminatory reason, either circumstantially or directly, by adducing evidence that discrimination was more likely than not a motivating factor." Padilla-Garcia, 212 F.3d at 77 (citations omitted). "In this way, the burden-shifting mechanism is significantly different from the device used in other employment discrimination contexts, such as Title VII cases, where a plaintiff is required to come forward with affirmative evidence that the defendant's nondiscriminatory reason is pretextual." Id. (citations omitted).

Wagner argues that Dean Jones's proffered reason for not hiring her has no factual basis. Wagner claims that during her interview, Professor Pettys asked her a follow-up question to Professor Burton's questions about whether analysis or writing was more important. Wagner responded that both were important. When Professor Pettys asked Wagner if she had to choose whether analysis or writing was more important, Wagner responded that it was an unfair question because both were important but, if she had to choose, she would emphasize writing. In her initial interview with the Committee, Wagner states she correctly differentiated between the Writing Center, which focuses on writing, and the LAWR program, which teaches

both writing and analysis. Her job talk notes, the only remaining documentation of the job talk, reference analysis twice. Wagner also maintains she knows analysis is important because she taught legal analysis as an instructor in George Mason's writing program.

Wagner further contends that all of the contemporaneous documentation from her interview process was positive and recommended that Wagner be hired. Seven professors complimented her on her interview, and her student feedback was more positive than the feedback Williamson received. Wagner received no negative feedback from her interview until February 25, 2007, when she received the faculty's hiring justification summary.

Moreover, Dean Jones told the faculty that she could hire two full-time LAWR instructors. Only three candidates were granted final interviews for the two positions and the third candidate was widely viewed as unsuccessful. While the hiring justification summary stated that, "Wagner's on-campus interview was less successful than Mr. Williamson's," the faculty provided no reason why they chose to recommend only Williamson to Dean Jones for the two full-time LAWR positions, when they could have recommended both Wagner and Williamson. Additionally, no justification has been provided for the faculty's failure to recommend Wagner for the multiple part-time adjunct positions for which she has applied. And Wagner has evidence that the faculty has never rejected a candidate who was recommended by the Committee for an adjunct position.

In reviewing the evidence, the district court adopted Dean Jones's version of the facts and concluded that Wagner failed to meet her burden of proof that Dean Jones failed to hire her based on her political affiliations and beliefs. But on a summary judgment motion, the court must view the facts in the light most favorable to the nonmoving party. Borgman, 646 F.3d at 522. The district court erred in viewing

-17-

the facts in the light most favorable to Dean Jones and resolving issues of fact in Dean Jones's favor.

After considering all the evidence, it is apparent that a dispute exists regarding a material issue of fact, namely whether Dean Jones would have made the same hiring decisions in the absence of Wagner's political affiliations and beliefs. Thus, the facts viewed in the light most favorable to Wagner are sufficient to establish a violation of her First Amendment rights.

B.     Clearly Established Law

The second question in the qualified immunity analysis is whether the right that Dean Jones allegedly violated was clearly established at the time of the violation. "Qualified immunity is an affirmative defense for which the defendant carries the burden of proof. The plaintiff, however, must demonstrate that the law is clearly established." Sparr v. Ward, 306 F.3d 589, 593 (8th Cir. 2002). It is not enough that a right be established in an abstract sense; rather "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Mathers v. Wright, 636 F.3d 396, 399 (8th Cir. 2011) (citing Anderson v. Creighton, 483 U.S. 635, 640 (1987)).

It is well established that "[t]he First Amendment prevents the government, except in the most compelling circumstances, from wielding its power to interfere with its employees' freedom to believe and associate, or to not believe and not associate." Rutan, 497 U.S. at 76. Thus, the First Amendment prohibits a state from basing hiring decisions on political beliefs or associations with limited exceptions for policymaking and confidential positions. Id. at 79. The state can neither directly nor indirectly interfere with an employee's or potential employee's rights to association and belief. Id. at 78.

The Supreme Court decided Rutan in 1990. Dean Jones does not contend that either the full-time or adjunct LAWR positions were policymaking or confidential positions and acknowledges that Wagner had a First Amendment right not to have her hiring decision based on her political beliefs and associations. Thus, Wagner has met her burden to prove that, at the time the hiring decisions were made, the law was clearly established that an employee seeking employment with the state cannot be denied a job based on her political associations or beliefs unless the position is a policymaking or confidential position.

Because Wagner has shown that the First Amendment generally prohibits a state from basing its hiring decision on political beliefs or associations, the question now is "whether a reasonable [dean] could have believed [not hiring Wagner] to be lawful, in light of clearly established law and the information [that the dean] possessed." Anderson, 483 U.S. at 641.

Dean Jones had several indications that Wagner's political beliefs and associations may have played a role in the faculty's hiring decisions. Only one law school faculty member out of 50 is a registered Republican. As dean, Dean Jones generally should have been aware of her faculty's point of view and its political tendencies.

Associate Dean Andersen contacted Dean Jones before Wagner interviewed for the full-time position and relayed Wagner's concerns about whether her politics would make it difficult for her to be hired. Dean Jones apparently did nothing to ensure that the faculty did not impermissibly consider Wagner's politics in making its recommendation as to whom she should hire even though Dean Jones was present for the faculty discussion on January 25, 2007.

After the faculty voted not to recommend Wagner for the full-time position, Associate Dean Carlson sent an e-mail to Dean Jones questioning whether Wagner's

politics played a role in the faculty's vote and if Wagner's politics would play a role in voting on whether she could teach the summer LAWR program or serve as an adjunct. Dean Jones apparently completed no further investigation other than speaking to Associate Dean Carlson. More importantly, Dean Jones took no steps to ensure that the faculty did not take Wagner's political associations and beliefs into consideration when the faculty voted on whether to recommend her for an adjunct LAWR position. Dean Jones supported Wagner's serving as an adjunct instructor because she asked Janis to follow up with Wagner to determine whether she was interested in the adjunct position. But Dean Jones refused to hire Wagner and instead relied on the faculty's recommendations. Dean Jones did not provide Wagner with any explanation as to why she chose not to hire her for any of the adjunct positions.

Dean Jones argues that the University has a standard policy for hiring law school faculty. The Committee receives the applications, screens the candidates, conducts the initial interviews, and then chooses candidates for a full-day interview. The faculty attends the job talk portion of the candidate's full-day interview and votes on whether to recommend hiring candidates to the dean. Dean Jones argues that as the dean, she has to hire the person whom the faculty recommends and that this has been the practice for the last 50 years.

The district court found "that Jones acted in strict conformity with long-standing hiring policy" and "deans routinely and consistently exercised no independent personal judgment in making hiring decisions but acted entirely on the advice and recommendations of a Faculty Appointments Committee." Wagner, however, presented evidence that at least one other dean in the past 50 years chose not to hire the person whom the faculty recommended. In her deposition, Dean Jones also conceded that she was free to refuse to hire the person recommended by the faculty and would do so in unusual circumstances:

Q.	So you have no authority whatsoever to do anything but authorize the faculty recommendation?

A.	I would imagine if there were some unusual circumstances, but, basically, I work at the authorization of the faculty if the process is working.

Jones Dep. 69:15-21. Dean Jones produced no evidence that this policy is a written policy, that her job position requires her to follow the policy, or any other evidence that the policy is a mandatory policy.

Whether Dean Jones had the ability to hire Wagner absent the faculty's vote is a genuine issue of material fact that the jury, not the court, should decide. Furthermore, Dean Jones was notified that the "process" may not have been working properly and the faculty may have violated the First Amendment, but she still made her hiring decision based solely on the faculty's suggestions. By her own admission, Dean Jones had the ability to hire someone whom the faculty had not recommended but chose not to do so. Dean Jones's conduct confirmed the faculty's recommendations, which a jury ultimately could conclude violated the First Amendment. Consequently, Dean Jones has not shown that a reasonable university dean in her position would have believed that failing to hire Wagner was lawful in light of clearly established law.

C.	Liability as a Supervisor

Dean Jones acted in her capacity as a supervisor. A supervisor incurs § 1983 liability

for a violation of a federally protected right when the supervisor is personally involved in the violation or when the supervisor's corrective inaction constitutes deliberate indifference toward the violation. The

supervisor must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what [he or she] might see.

Ottman v. City of Independence, Mo., 341 F.3d 751, 761 (8th Cir. 2003) (alteration in original) (citation and internal quotations omitted). "[A] supervisor can act with 'deliberate, reckless indifference' even when [s]he does not act 'knowingly.' " Kahle v. Leonard, 477 F.3d 544, 551-52 (8th Cir. 2007). "A supervisor can be found liable under § 1983 for deliberate indifference if [s]he is aware of 'a substantial risk of serious harm,' even if [s]he is not aware that the harm has, in fact, occurred." Id. (quoting Farmer v. Brennan, 511 U.S. 825, 842 (1994)).

But a supervisor " 'is only liable for [her] . . . own misconduct' and is not 'accountable for the misdeeds of [her] agents' under a theory such as respondeat superior or supervisor liability." Whitson v. Stone Cnty. Jail, 602 F.3d 920, 928 (8th Cir. 2010) (quoting Ashcroft v. Iqbal, 556 U.S. 662, ____, 129 S. Ct. 1937, 1949 (2009)). " 'A supervisor may be held individually liable under § 1983 if [s]he directly participates in the constitutional violation . . . .' " Riehm v. Engelking, 538 F.3d 952, 962-63 (8th Cir. 2008) (alterations in original) (quoting Brockinton v. City of Sherwood, Ark., 503 F.3d 667, 674 (8th Cir. 2007)). Wagner's claim against Dean Jones is based on Dean Jones's own actions and omissions during the hiring process. Wagner has alleged facts establishing that even though Dean Jones was on notice that Wagner's political beliefs and associations may have impermissibly affected the faculty's hiring recommendation, she still refused to hire Wagner for any position. Accordingly, Dean Jones's position as a supervisor does not shield her from § 1983 liability.

The district court erred in finding that qualified immunity protects Dean Jones from liability in her individual capacity. We reverse the district court's grant of summary judgment as to Carolyn Jones in her personal capacity, and we remand for further proceedings consistent with this opinion.

_____