# United States Court of Appeals

## For the Eighth Circuit

_____

No. 18-1965

_____

Dan Charleston

*Plaintiff - Appellant*

v.

Bill McCarthy, in his individual and official capacity as Polk County Sheriff

*Defendant - Appellee*

Helen Youngs, in her individual capacity; Florence Buhr, in her individual capacity; Bill Hansen, in his individual capacity; Victor J. Munoz, in his individual capacity

*Defendant*s

_____

Appeal from United States District Court
for the Southern District of Iowa - Des Moines

_____

Submitted: January 17, 2019
Filed: June 13, 2019

_____

Before GRUENDER, WOLLMAN, and SHEPHERD, Circuit Judges.

_____

SHEPHERD, Circuit Judge.

Following his unsuccessful bid to unseat Polk County, Iowa Sheriff Bill McCarthy, Dan Charleston sued Sheriff McCarthy and several other county employees, alleging various claims related to the treatment Charleston asserts he suffered as a result of his political beliefs and associations. After dismissing the other defendants and several claims, the district court[1] granted summary judgment in McCarthy's favor on the remaining First Amendment discrimination and retaliation claims. Charleston appeals the adverse grant of summary judgment. Having jurisdiction under 28 U.S.C. § 1291, we affirm.

I.

Dan Charleston joined the Polk County Sheriff's Office in 1997 and served as a sergeant in that office at all times relevant to this action. In 2008, Bill McCarthy was elected as Polk County Sheriff. He sought reelection in 2012, again running as a Democrat. In 2010, Charleston announced his intentions to challenge McCarthy, running as a Republican candidate for sheriff.

The campaign between McCarthy and Charleston was contentious, with each candidate criticizing the other. Several issues regarding Charleston's performance arose. During the campaign, a sheriff's department employee disclosed to a reporter that Charleston had been previously terminated from the Pomona, California Police Department after the department discovered that Charleston had lied in an official police report. Additionally, in February 2012 Charleston served a two-day suspension from the Polk County Sheriff's Department related to failure to render medical aid to a person with a medical emergency. This suspension stemmed from an incident where Charleston arrived on the scene of an emergency call before paramedics and observed an unconscious man bleeding from the nose; neither

---

[1]The Honorable Stephanie M. Rose, United States District Judge for the Southern District of Iowa.

Charleston nor another deputy on the scene rendered any aid to the man, who later died. After a complaint from the Fire Chief and an investigation by the Office of Professional Standards (OPS), Charleston's direct supervisor recommended that Charleston be suspended for three days, and the next highest officer recommended that Charleston be suspended for two days.[2] Charleston appealed his suspension to McCarthy, who imposed the recommended two-day suspension. A medical examiner later determined that the deceased individual would not have survived even if Charleston and the other deputy rendered aid.

During an October 2012 campaign debate, McCarthy spoke about Charleston's campaign website referencing a group called the Oath Keepers. McCarthy described the group's views as "about as radical as it gets" and "the kind of garbage you're going to get if [Charleston] is elected." During this same debate, Charleston expressed his view that he had been intentionally left off of a promotion list and that McCarthy refused to promote Charleston due to his political beliefs. McCarthy responded that "sometimes when people don't get promoted, there's a reason behind that too," but did not mention Charleston's political beliefs.

Sheriff McCarthy was reelected. On December 6, 2012, McCarthy held a "clear the air" meeting with Charleston. Both men discussed issues that had arisen during the campaign, including Charleston's suspension and his termination from the Pomona Police Department. Prior to the campaign, McCarthy had been unaware of Charleston's termination and expressed his concerns, including whether he had an obligation to disclose to criminal defendants Charleston's previous dishonesty. McCarthy also made several statements about Charleston's continued role in the Polk County Sheriff's Department:

---

[2]The supervisor also recommended that the other deputy involved receive a two-day suspension, but the deputy received no discipline because he had retired.

You're not going to be a shadow sheriff and be here and survive in this office. You're not going to be the spokesperson for the rank and file, and you're not going to talk against policies in this administration and get by with it. I'm going to hold you accountable to the general orders, and you're going to have some difficult road ahead if you can't fall in and just act as a sergeant and support the administration.

\*\*\*

You're going to be talked to by internal affairs shortly about some of the things that you've done to undermine here since the election so you need to cooperate with that, and you need to understand you're going to be held accountable to the standard that's outlined in the rules and regulations. You're not the shadow sheriff, and I say that again, and you're not going to be viewed that way.

McCarthy also expressed his view that Charleston had been "a cancer [in the department] for 18 months." Charleston challenged McCarthy as to whether McCarthy's true intention was to push Charleston out of law enforcement; McCarthy responded that while he believed Charleston's dishonesty in a police report should preclude him from serving in law enforcement and that Charleston should resign, he intended to allow Charleston to remain with the department, stating Charleston had "a place here [in the department] if [he would] just accept the position [he had] and make the best out of that."

In January 2013, the Department OPS began an investigation into whether, in November 2012, Charleston had acted improperly by directly contacting three other department employees and discussing union practices and officer transfers. After OPS determined that Charleston's conduct violated the Iowa Code provision governing collective bargaining and the rights of public employees and that Charleston had interfered with employees and had been untruthful during the course of the investigation, three of Charleston's supervisors recommended to McCarthy appropriate discipline. The discipline ranged from counseling Charleston regarding

-4-

the interference to demotion, suspension, or termination for lying and violating the Iowa Code. On February 15, 2013, Charleston and McCarthy met again to discuss the recommended discipline. During this conversation, McCarthy admitted that he had previously stated that Charleston was "cancerous" and "a liar," that he did not trust Charleston, and that he wanted to "decertify," or force Charleston out of law enforcement, but maintained that these statements did not reflect McCarthy's true feelings: "I have said those things [] but I also tell you that I have mixed feelings and I maintain there is a place here for you even with that background that you have that I believe should prohibit you from being in law enforcement, but you're here." McCarthy went on to state,

> I don't want to be unfair with you either and I want to give you an opportunity to have this job and flourish, you've got the job, it's your job, it's not my job, but you're not going to maintain that job if you can't act supportive [in] particularly in the role that you've got as a supervisor. You're not going to be the representative of the rank and file, you're not going to run your own Sheriff's Department and you're not going to constantly try to undermine, for whatever purposes that you have in mind or have had in mind, to try to undermine the direction of this administration and be successful.

Following this meeting, McCarthy issued a letter of reprimand to Charleston. The letter of reprimand stated that Charleston violated the Sheriff's Office General Orders concerning harmony in the office. The reprimand noted that, during the OPS investigation, Charleston stated repeatedly that he could not remember or recall key details and conversations and claimed to be able to remember only comments or statements that reflected positively on Charleston. The reprimand stated that Charleston had been less than credible, that his answers were evasive, and that he did not cooperate with the OPS investigation. The reprimand constituted formal discipline and was placed in his personnel file, but did not have any impact on Charleston's salary.

On March 9, 2013, McCarthy transferred Charleston from the Patrol Division to the Transport Division. McCarthy stated that this was, in part, an effort to alleviate his concerns about Charleston's credibility in view of his previous termination for dishonesty and his dishonest and uncooperative behavior during the OPS investigation. The Transport Division coordinated and handled prisoner transport. Charleston's position within the Transport Division required him to work regular business hours; he experienced no change in pay from the Patrol Division; he supervised 4 employees in Transport while he had previously supervised 12 in Patrol; and Charleston no longer had a patrol vehicle.

Charleston filed this action in April 2014, pursuant to 42 U.S.C. § 1983, alleging First Amendment, due process, and Fourteenth Amendment claims against McCarthy and four other county employees, including one sheriff's department employee and three Polk County Civil Service Commissioners who were involved in promotions within the sheriff's department. After the district court dismissed the claims against the commissioners and the sheriff's department employee, as well as one claim against Sheriff McCarthy, the only remaining claims for disposition were Charleston's claims against McCarthy for First Amendment political discrimination and retaliation. Charleston alleged that, once he announced his candidacy for sheriff, he was subjected to harassment and discrimination based on his political views and that McCarthy retaliated against Charleston for his political associations through a number of means, including suspension, reprimand, transfer, and failure to promote. McCarthy moved for summary judgment on these claims, which the district court granted. As to Charleston's discrimination claim, the district court held that Charleston failed to make a prima facie case because he offered no evidence that his purported unfair treatment was in any way related to his political views and affiliation as a Republican. As to the retaliation claim, the district court determined that Charleston failed to make a prima facie case because he could not identify an adverse employment action and, even if he could demonstrate an adverse employment action,

he could not show the requisite causal connection between the adverse actions and his participation in protected First Amendment activity. This appeal follows.

## II.

Charleston asserts that the district court erred in granting summary judgment in favor of McCarthy on both Charleston's First Amendment discrimination and retaliation claims. "We review de novo a grant of summary judgment, considering the facts in the light most favorable to the nonmoving party. Summary judgment is proper when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law." Meuir v. Greene Cnty. Jail Emps., 487 F.3d 1115, 1118 (8th Cir. 2007).

With respect to his First Amendment discrimination claim, Charleston asserts that he presented a prima facie case by showing he ran for sheriff as a Republican, that he suffered adverse employment actions in the form of the reprimand and the transfer, and that McCarthy made statements providing "direct evidence of political discrimination." As to his First Amendment retaliation claim, Charleston asserts that he had sufficiently shown that he was reprimanded, suspended, transferred, and left off of a promotion list, all due to his decision to challenge McCarthy as a Republican candidate for sheriff. McCarthy also asserts that the district court applied the incorrect burden-shifting framework in evaluating his retaliation claim.

The First Amendment prohibits government officials from discriminating against public employees based on political affiliation, where political affiliation is not an appropriate job requirement. Rutan v. Republican Party of Ill., 497 U.S. 62, 64, 75 (1990). A nonpolicymaking employee who alleges First Amendment discrimination must make a prima facie showing that: (1) he has a specific political or ideological affiliation; (2) he suffered an adverse employment action; and (3) the political or ideological affiliation was a substantial or motivating factor for the

adverse employment action. Wagner v. Jones, 664 F.3d 259, 270 (8th Cir. 2011). "A plaintiff alleging First Amendment retaliation must . . . make a prima facie showing that (1) []he engaged in conduct protected by the First Amendment; (2) []he suffered an adverse employment action; and (3) the protected activity was a substantial or motivating factor in the employer's decision to take the adverse employment action." Id. at 270.

Both of Charleston's claims suffer from the same fatal flaw: the lack of an adverse employment action. "An adverse employment action is a tangible change in working conditions that produces a material employment disadvantage. This might include termination, cuts in pay or benefits, and changes that affect an employee's future career prospects." Wagner v. Campbell, 779 F.3d 761, 766 (8th Cir. 2015) (quoting Clegg v. Ark. Dep't of Corr., 496 F.3d 922, 926 (8th Cir. 2007)). But "minor changes in working conditions and no reduction in pay or benefits will not constitute an adverse employment action." Spears v. Mo. Dep't of Corr. & Human Res., 210 F.3d 850, 853 (8th Cir. 2000). Further, "[l]esser actions than demotion, suspension, and termination can be adverse employment actions if their cumulative effect causes an employee to suffer 'serious employment consequences' that adversely affect or undermine his position." Shockency v. Ramsey County, 493 F.3d 941, 948 (8th Cir. 2007).

Charleston identifies several actions that he asserts are adverse employment actions, either independently or cumulatively: his 2012 suspension and McCarthy's refusal to rescind it; his 2013 reprimand; his transfer from the Patrol Division to the Transport Division, and his being left off of the promotion list. Although Charleston is not explicit in which actions he considers independent adverse actions and which he argues cumulatively constitute an adverse action, none of the complained-of actions, either together or separately, constitute an adverse employment action.

First, with respect to Charleston's suspension, we note that Charleston filed this action on April 24, 2014 and the suspension occurred in February 2012. The suspension thus falls outside the applicable two-year limitations period, as the district court explained in a previous ruling on a motion to dismiss. Order 6, Dist. Ct. Dkt. 9 (citing White v. Kautzky, 494 F.3d 677, 681 (8th Cir. 2007) for two-year statute of limitations for § 1983 claim under Iowa law). While a suspension can constitute an adverse employment action, see Shockency, 493 F.3d at 948, an adverse employment action is completed at the time it occurs and cannot be revived by a mere request for reconsideration. See Rogers v. Metro Bi-State Dev., No. 4:08-CV1627 CEJ, 2010 WL 1186523, at *2 (E.D. Mo. Mar. 29, 2010) (citing Gipson v. KAS Snacktime Co., 83 F.3d 225, 229 (8th Cir. 1996) and Boersig v. Union Electric Co., 219 F.3d 816, 821 (8th Cir. 2000), abrogation on other grounds recognized by Rowe v. Hussman Corp., 381 F.3d 775 (8th Cir. 2004)). Charleston's request that McCarthy rescind the suspension, made months after the suspension and after Charleston learned that the decedent's estate was unlikely to sue Charleston or the sheriff's department, cannot revive the adverse employment action to bring it within the appropriate limitations period.

As to Charleston's 2013 reprimand, a reprimand constitutes an adverse employment action "only when the employer uses it as a basis for changing the terms or conditions of the employee's job for the worse." Campbell, 779 F.3d at 767. The record is devoid of any evidence that the 2013 reprimand in any way changed the terms or conditions of Charleston's employment. It did not involve any reduction in pay or otherwise adversely affect his employment; it was merely documented in his personnel file. This is insufficient to demonstrate that the reprimand was an adverse action. See Elnashar v. Speedway SuperAmerica, LLC, 484 F.3d 1046, 1058 (8th Cir. 2007) ("The reprimand did not affect [plaintiff's] terms and conditions of employment, so he cannot make out a prima facie case on this claim."). To the extent that Charleston argues that the reprimand adversely affected his employment conditions by resulting in the transfer, as we conclude that the transfer did not

detrimentally affect Charleston's employment conditions, discussed below, we reject this argument.

A transfer may constitute an adverse employment action where it materially alters the terms or conditions of employment, like an employee's title, pay, or benefits. Ledergerber v. Stangler, 122 F.3d 1142, 1144-45 (8th Cir. 1997). But a transfer may impose some changes in employment circumstances without amounting to an adverse employment action; "a *purely* lateral transfer, that is, a transfer that does not involve a demotion in form or substance, cannot rise to the level of a materially adverse employment action." Id. at 1144 (internal quotation marks omitted). Despite Charleston's assertions, the record does not reflect that his transfer from Patrol to the Transport Division materially altered his employment conditions. The transfer did not reduce Charleston's pay; he remained in a supervisory position even though his number of direct supervisees decreased; he remained in the position for two-and-a-half months before being transferred to another department that gave him more supervisees; he was still eligible to work overtime and to use a patrol car when needed; he was routinely transferred between divisions at least eight times during his employment with the department; and Charleston admitted that the Transport Division performed essential functions of the sheriff's department. Based on this record, the transfer does not qualify as an adverse employment action because it did not adversely affect Charleston's employment conditions.

Finally, we see no merit to Charleston's contention that being left off of the promotion list due to the suspension and reprimand was an adverse employment action. Charleston offers no evidence as to how the promotion list is compiled or the significance of the list. The record contains no evidence as to factors that went into inclusion on the list or how the list operated, and there is no evidence that a suspension or reprimand would bar a sergeant from appearing on the promotion list. Charleston's theory, as the district court noted, is devoid of evidentiary support. Although "failure to promote can constitute an adverse employment action that would

-10-

support a plaintiff's retaliation claim[,]" AuBuchon v. Geithner, 743 F.3d 638, 643 (8th Cir. 2014), Charleston presents no evidence that would allow us to conclude that he was deprived of a promotion by being left off the list. We thus conclude that Charleston's omission from the promotion list is not an adverse employment action. See Wilson v. Miller, 821 F.3d 963, 969 (8th Cir. 2016) (concluding that plaintiff's claim that poor performance review resulted in lack of promotion was unsupported by evidence that she would have received a promotion but for the negative review and thus was not an adverse employment action).

None of these complained-of actions constitutes an adverse employment action on its own; cumulatively, these actions also did not result in "serious employment consequences" that adversely affected or undermined Charleston's position. See Shockency, 493 F.3d at 948. Despite Charleston's complaints, he remained a sheriff's department employee with the same title, pay, and benefits throughout the relevant time frame. Although his job duties did change during this time, we find this to be less than noteworthy given that he has transferred no less than 8 times during the duration of his employment with the sheriff's department and 6 times prior to the 2012 election campaign.

Charleston has failed to demonstrate that he suffered an adverse employment action. We thus conclude that Charleston failed to present a prima facie showing and affirm the district court's grant of summary judgment to McCarthy on both Charleston's discrimination and retaliation claims.[3] See Duffy v. McPhillips, 276 F.3d 988, 991-92 (8th Cir. 2002) (affirming summary judgment where plaintiff failed to show alleged adverse action to sustain retaliation claim); see also Maymí v. P.R. Ports Auth., 515 F.3d 20, 28-29 (1st Cir. 2008) (affirming summary judgment where

---

[3]Because we conclude that Charleston fails to make a prima facie showing, we need not address his argument that the district court also erred by applying the incorrect burden-shifting framework to his retaliation claim; the burden-shifting framework is inapplicable until a plaintiff has successfully shown a prima facie case.

plaintiff failed to show alleged adverse employment actions occurred based on her political opinions and thus failed to make a prima facie showing of political discrimination).

III.

For the foregoing reasons, we affirm.

_____